ALBERT H. ATHA, petitioner,

*v.*

MARY H. ATHA, defendant; J. LAWRENCE DIAS, intervening
defendant.

[Decided May 16th, 1923.]

1. Where letters admittedly written by the defendant were bought
by the petitioner in a divorce suit, the fact that they were paid for
does not affect their admissibility or their credibility.

2. Where depositions from servants in the household without this
state are presented, the fact that the petitioner gave sums of money
to the deponents, and, in one case a present before the deposition was
taken, may go to the credibility of the depositions, but does not affect
their admissibility.

3. A motion to amend an answer setting up condonation, con-
nivance and acquiescence should be granted, but these matters might
have been considered without amendment, under the equity doctrine
of clean hands.

4. Evidence examined and *held* sufficient to prove the adultery
charged by the petitioner, and further 'held that such adultery has
been condoned and acquiesced in to such extent that the petitioner
cannot come into court and ask relief.

On petition for divorce, &c.

*Messrs. McCarter & English* (by *Messrs. Robert H.* and
*George McCarter*) for the petitioner.

*Mr. Nicholas W. Bindseil,* for the defendant, Mrs. Mary
H. Atha.

*Mr. Merritt Lane,* for the intervening defendant, J. Law-
rence Dias.

CHURCH, V. C.

I will in the first place dispose of legal questions which
were propounded to me during the course of the trial. Some

of them have not been seriously pressed, but as they have been raised I feel that I should dispose of them. 1. Letters admittedly written by the defendant, Mrs. Atha, and the co-respondent, Dr. Dias, were offered in evidence. Objection was made by counsel for the co-respondent on the ground that either before or after the letters were turned over to Mr. Atha money was paid by Mr. Atha to the persons in possession of these letters. I cannot see how this affects either their admissibility or their credibility, the letters being admittedly in the handwriting of the defendant and the co-respondent.

2. Depositions are presented from servants in the Atha household residing without the state. It is admitted that the petitioner gave sums of money to the deponents and in one case a present before the deposition was taken. While I feel that this may go to the credibility of the depositions, I do not think that it goes to their admissibility. I will, therefore, receive them, and I will consider both the letters and the depositions later on. 3. A motion was made to amend the answer, setting up condonation, connivance and acquiescence. I have allowed the amendment, as I think I have a right to do. Moreover, I feel that under the general equity powers of the court, even without amendment, I have a right to consider these defences in a case where a petitioner is seeking a divorce on the ground of adultery from his wife, under the doctrine of clean hands. *Rapp* v. *Rapp*, *67 N. J. Eq. 236* (at *p.* 238); *Young* v. *Young, 94 N. J. Eq. 155*. 4. Evidence of the defendant was offered seeking to show that the petitioner had kicked her and treated her with extreme cruelty. There is nothing in the answer or the counter-claim alleging extreme cruelty. I shall, therefore, disregard this testimony.

The facts of the case, briefly stated, are these: Mr. and Mrs. Atha were married in 1906 and lived together in apparent happiness until 1908, when the petitioner threatened to leave his wife. A reconciliation was effected and they continued to live together. In 1910, or thereabouts, the co-defendant, and the re-respondent, Dr. J. Lawrence Dias,

came into the life of Mr. and Mrs. Atha. His visits to the Atha house became more and more frequent, both in a professional capacity and as a friend of Mr. and Mrs. Atha. He treated Mrs. Atha at his office at very frequent intervals. In the earlier years Mr. Atha paid physician's bills to Dr. Dias. Later on none were sent and none were paid. Mr. Atha now files a petition alleging adultery on the part of his wife with Dr. Dias as co-respondent. The only direct evidence of acts of adultery is that of Mrs. Hannah Miller, who testified that on one occasion she stood on the stairs leading from the second to the third floor, looked into the bedroom, and saw Dr. Dias and Mrs. Atha lying on the couch and embracing. She said that the door was open about two feet. She also says that while ascending the stairs from the first to the second floor she looked into the living-room and saw Dr. Dias and Mrs. Atha in affectionate embrace on the sofa in the living-room. She also says that looking from the pantry into the living-room she could see Mrs. Atha sitting on Dr. Dias' lap and telephoning to her husband, saying that she was lonely.

At the conclusion of the case I went to the Atha home, accompanied by my stenographer and by counsel and placed myself in the positions in which this witness testified that she stood when she saw these alleged acts of adultery. It is admitted that the furniture in these various rooms is now as it was and always has been. I took my position on the stairs on the third floor, where the witness testified she stood, and counsel for the petitioner stood next to me. The door was open to the extent she testified, two feet. It was impossible to see into the room. I then directed that it be opened three feet. It was impossible to see into the room. I then directed that it be opened to three feet, six. It was impossible to see into the room. I then directed that the door be opened to its fullest capacity. It was possible to see a very small portion of the couch in question, but the view was not sufficient at that point to have observed any improper conduct. Mention was made of a crack in the door. I looked at that. It was impossible to see through it. Mention was

also made of a transom.   The transom is of ground glass and nobody could see through it.   I then investigated the statement of this witness that she observed improper conduct in the living-room from the stairs leading from the first to the second floor.   Accompanied by counsel, I took my stand on every step from the first to the second floor.   It is impossible to see into the living-room on any step on these stairs.   I then went into the pantry and placed myself in the situation in which the witness testified she was.   It is possible to see into the living-room from this point.   However, there are heavy portiers, which, if drawn, would preclude any view.   I then went outside the house and looked into a window, in which the witness said she looked.   It is impossible to see from that point.   I think the maxim *"falsus in uno, falsus in omnibus"* applies as to this testimony.   It is a physical impossibility for this woman to have seen three-fourths of what she swore she saw.   I therefore reject her testimony absolutely and shall not consider it.

Adultery need not be proved by eye-witnesses to the actual acts.   If desire and opportunity are proved, adultery will be presumed.   The depositions of the servants state that Mrs. Atha expressed her love for Dr. Dias, and one says that on a certain day Mrs. Atha came from his office and confessed to the deponent that she had committed adultery with the doctor.   I should be inclined to place little credence on these depositions, realizing that they were bought, except for the fact that I think that they have been substantially corroborated by the other circumstances in the case, and especially by the letters of the defendant, and of the co-respondent, which I have admitted in evidence.

It is clearly proved that Dr. Dias was a frequent visitor at the Atha home; that he dined there almost every night; that Mrs. Atha frequently went to the doctor's office for treatment; that when he came to her house, sometimes when Mr. Atha was there and sometimes when he was not there, it was their custom to go to Mrs. Atha's room, she being undressed and in bed, and to stay there until late hours.

They admit that occasionally, as they say, they went to New York together, unattended, at one time walking through Central Park and afterwards going to dinner and the theatre. One of the witnesses, William Cummings, says that he saw them at the Newark station of the Hudson tubes and went on the same train with them to New York, where, with a dress suit case, they disappeared together in a crowd. This was on a day when Mr. Atha had left Newark on a business trip. They admit that on one occasion on an automobile trip, while in Virginia, they left Mr. Atha and went to Richmond, Virginia, spending the night at a hotel, occupying adjoining rooms, Mr. Atha arriving the next day. They admit that while on a trip to Cooperstown, while Mr. Atha was at breakfast downstairs, Dr. Dias, who had occupied an adjoining room, was discovered by Mr. Atha taking breakfast in Mrs. Atha's bedroom, she in negligee.

We now come to the consideration of the letters introduced in evidence in this case. Of the two from Dr. Dias to Mrs. Atha, in this case, one is addressed "My Darling Tomp" (the testimony says a pet name), the other, "My Dear Tomp." I will quote passages from them. This from the Dear Tomp letter:

"I have never been so happy in all my life, although just at present I am sad at being away from you. I often wonder at my extreme good fortune in having met you, sweetheart, and trust that my lucky star will always continue in the ascendent. My pleasure last evening was complete and I look forward to having many such happy ones with you. I will think of you every minute and will look forward with great pleasure to seeing you again Saturday. Goodnight, dear, and with best love."

Mrs. Atha admits in her testimony that she wrote the letter introduced in evidence to Dr. Dias, but declares she did not send it. This is referred to in the testimony as the torn letter. It was purchased by Mr. Atha from the servant in pieces and was patched together. The omissions are explained by the fact that some of the pieces were missing. I will quote the torn letter in its entirety:

"Monday. My dear Lawrence: It is now two o'clock and I have not closed my eyes thinking over what is best for us both and have decided to give you up, for I understand as never before you do not love me and I cannot trust you, do what I wish if those moods come. I am afraid of them and a life of happy memories is worth much more than the trouble I have had of late. I am sorry you were not brave enough to tell me you did not love me for I would have gone completely out of your life at any time nor would I have gotten in it had I dreamed the truth. Never in my life can I believe a girl needed love and sympathy as I do now, when I think of our little talks of such troubles, and actually what they were when I met it with you. I am turned to stone and such a being as Laurie seems to have died, or never lived, just an ideal that I made, for I longed so to give and be loved in the right way. Oh, if I let myself think of our days and those ambitious future plans then I cannot breathe. How wonderful I thought it to have someone to lean on to go through this world, but by degrees every bit of milk spilled, and for what? I am afraid a selfish wish to be it with everyone but me. I want to give you a last bit of advice, Lawrence—weigh your feelings and plans, don't be so impulsive. Now, as regards our serious troubles I shall do nothing, just wait and when the end comes it will be over for us both in some way. People will have to find their own answer. Some may think they know, not through me, but I hope no one will make trouble. You will be saved all except a loss that could it have been, might have made you happy, but we will not be, for others that is sure. I tried to get you at the lodge tonight, but they said you left at 9:20, it was 9:30. I wanted to say goodnight so I could try to sleep, for I felt ill and nervous. I hope it will not make trouble for you, is it not wonderful how peaceful I am after the storm. I shall enjoy my home, family and a few old friends, and try to make them love me just a little before the end, it is good that I will not have to go alone, but I want to see my baby, Laurie, and feel what it is to love my own and yours."

Mrs. Atha, on the witness-stand, said that this sentence should read:

"To love my own and you. You cannot begrudge me that. It is a small lot for what I must suffer and all alone (blank) I know I shall (blank) rest when I have recovered there will be no (blank) coming. Please keep my poor old secrets and I will keep yours. The money I will get to you when I can and I will also have Andrew fixed somehow. I shall be perfectly happy, not jealous, if anything just glad that I am (blank) to realize the reason of y (blank) ds and strong enough t (blank) up before it is too late for (blank). I wish you (blank) luck, but I am afraid of it. Please don't go to pieces. You have done nothing Lawrence afterall, I prefer death to life as it is now and that will be a certain kind of happiness, it is really true, I hated to tell you I knew when I saw how you were feeling. Albert has promised to be kind to me as I explained to him I was very

nervous and must give up and after a while I would be well and then life would start for him. I am glad I have a little faith in God to-night. I have read over chapters I loved when father used to read my prayers, and I feel a certain faith and belief creeping on me that I will be forgiven for all I have done and will do. It is hard to explain to you for you don't want to believe, but it comforts me; and I am going to cling to anything that does. I would like to keep your things for a while, but all will be returned in time. Please make sure not to make any more mistakes. I only want no other woman to li (blank) through another spell like this, for it is too hard if you love. Good night Laurie, Mary."

Whether or not this letter was ever received, it seems to me it is a very damaging admission of her feelings towards the doctor.

There are other letters written by Mrs. Atha to a servant, in which she speaks in endearing terms of Dr. Dias. These quotations from letters from Mrs. Atha to the servant, Mary Mass:

"The doctor has been so dear. We went to the theatre Thursday and dinner in New York and also Saturday, he leaving at midnight to visit his mother until Tuesday. I just wonder what will happen, I don't know what to do. I care so very much and yet I am so afraid of all it means. We don't have words any more and there is nothing he does not do for me [referring to Dr. Dias], gave away his wedding present, a watch fob from Mrs. Dias, the other day. He is more thoughtful all the time."

Another: "The doctor has been here twice, acted so kind and sweet I could not ask for more."

Dr. Dias testified that he had a fondness and affection for Mrs. Atha, but that this fondness and affection was purely platonic. He says that he often discussed with Mr. Atha the question of securing a divorce from the doctor's wife and then of "taking care of Mary" (Mrs. Atha), although I may say in passing that it is difficult to conceive how the doctor could properly take care of "Mary," even if he had a divorce from his wife, inasmuch as Mary was already the wife of another man. Mrs. Atha says: "I was very fond of the doctor; I was lonesome; I had lost my baby; I wanted to be loved." She admits that if the doctor had been able to get a divorce, and everything otherwise was all right, she would have been very glad to marry him.

Without analyzing this distressing testimony any further, I am of the opinion that the adultery charged in the petition has been proved and that Mrs. Atha and Dr. Dias are guilty of adultery. However, there is another legal question to be considered in this connection. Was there condonation, connivance or acquiescence on the part of Mr. Atha? Let us analyze the testimony a little further. Mr. Atha admits that he knew of the frequent visits of Dr. Dias to his wife. He sanctioned them. Sometimes he was at the house when these visits occurred, and sometimes knew of them but was too busy to come home and join in the party. He knew that Mrs. Atha was in bed and the doctor in her bedroom up to a late hour, and he testifies that sometimes he would get up from his own bedroom after being asleep and tell the doctor it was time to go home. He admits that when an automobile was purchased he permitted Dr. Dias to pay $200 or $250 on account of this automobile; that the doctor paid for a bumper to be put on the car; that the doctor paid for two trunks to be annexed to the car, and for other accessories. He says that in regard to one car that was bought Mrs. Atha desired to have it painted a dull gray. He preferred maroon. He could not persuade his wife to have it painted maroon, so he asked Dr. Dias to use his influence with his, Atha's wife, so that Atha's ideas could be carried out. The influence was exerted, he says, and Mrs. Atha acceded to Dr. Dias' request, which was really his.

He explains the southern trip before alluded to in this way: That he and the doctor and Mrs. Atha were mired, their motor having become stuck in the mud. He, apparently, thinking more of his automobile than his wife, decided to remain with it, and permitted his wife to leave in another automobile with Dr. Dias to spend the night in Richmond, he saying that he would come on later, going so far as to transfer part of her wardrobe from a trunk in his automobile to dress-suit cases, which were placed in the automobile in which Mrs. Atha and Dr. Dias departed. Later on he modified his testimony by saying that he thought they were only going as far as Cumberland Court House, about fifteen miles distant, there

to spend the night, and he would follow them with the car.
Let us then take his own revised statement. When he arrived
at Cumberland Court House he was informed that his wife
and Dr. Dias had not stopped there but had gone on to Rich-
mond. He, therefore, spent the night at Cumberland County
Court House, and went on the next day to Richmond. He
says they could not have gotten to Richmond that night.
How did his wife and Dr. Dias get there a few hours before?
When he arrived at Richmond and found that his wife and
the doctor had registered in adjoining rooms he deprecated
it, said they should not have done it, but yet continued his
intimacy with Dr. Dias. I may say here that all these trips
which he took before and after this with his wife and Dr.
Dias were paid for by Dr. Dias.

In the matter of the Cooperstown incident, Mr. Atha says
that he left his wife when he went to breakfast, knowing that
Dr. Dias was in an adjoining room, and when he came back
and found his wife and Dr. Dias in her room having break-
fast, she in negligee, he made no objection.

Another incident: He decided to go to Red Bank on a
fishing trip. Dr. Dias called him up on the telephone, said
that he was at Mrs. Atha's house, that she was very ill and he
must come home immediately. He said he did not believe she
was ill and declined to come, explaining that there had been
a change in the schedules of trains. Dr. Dias thereupon an-
nounced that he was going to spend the night in Mrs. Atha's
house. Mr. Atha made no objection.

In 1917 Mr. Atha testifies he became annoyed at these at-
tentions of Dr. Dias to his wife and told her that he intended
to leave her. After protestations on her part and recrimina-
tions on his, he decided to remain. He did remain and per-
mitted the attentions of Dr. Dias to continue. About five
months before he left his wife he discovered some pills in her
possession, which he said he believed to be morphine given by
Dr. Dias. It is a matter of common knowledge that addiction
to this drug lowers the moral tone and makes the addict ir-
responsible and willing to do almost anything to obtain the
drug. This was admitted by Dr. Dias himself and one of his

own witnesses, Dr. Leyenberger, who went so far as to say: "Those addicted to the drug will do anything, almost commit murder." Mr. Atha did nothing to find out whether or not the pills he had discovered contained morphine, or to have them analyzed, as he should have done at once. Under repeated questions from me he said, "I did nothing, I wanted to be sure." In other words, he was content to allow the shocking condition he suspected to continue until he thought he had absolute legal evidence which would permit him to get rid of his wife.

On the first day of this trial, which lasted seven days, Mr. Atha, on cross-examination, said that he could not remember whether a discussion had been held between his wife, Dr. Dias and himself, regarding a divorce between Dr. Dias and his wife, in which it was said that Mr. Atha desired Dr. Dias to hurry up his divorce so he could take care of Mary. Although he did not remember it at that time he said that he would not swear that such conversations had not been held. On the seventh day of the trial, after hearing the testimony of his wife and Dr. Dias, who testified to these conversations, he was recalled to the stand and denied categorically that any such conversations had been held. In this instance I believe the testimony of Mrs. Atha and Dr. Dias.

He also admits that Mrs. Atha informed him at one time that Mrs. Dias, wife of the co-respondent, had been to her house and stayed about two hours, berating her for her conduct with Dr. Dias. Mr. Atha says he remarked she should not put herself in any such position. He, however, continued his intimacy with Dr. Dias, continued to permit his wife to see him, and continued to allow Dr. Dias to pay for automobile trips for Mrs. Atha, the doctor and himself.

I cannot imagine how any sane man could be so colossally stupid as to stand by for a period of nearly ten years and observe and participate in the incidents I have described without being suspicious. The best that can be said is that he was absolutely indifferent to his wife and her conduct, and absolutely unappreciative of the duties of a husband, both

legal and moral, to protect his wife's fair name, and to see that she was not improperly led into temptation.

On the witness-stand he said, "I admit I was a fool." As far as this statement goes, I am not disposed to disagree with him.

I, therefore, find that, although the adultery charged in the petition has been proved, that it has been condoned and acquiesced in to such an extent that the petitioner cannot come into this court and ask for relief. It is one of the axiomatic principles of equity that the petitioner must come into court with clean hands, and cannot stand by and acquiesce in conduct by his wife which will inevitably result in her downfall. If he has serious suspicions of her unfaithfulness, he cannot overlook and condone them without investigation and continue intimate relations with a man who he supposes is violating his wife's chastity or debasing her morality. In *Hedden* v. *Hedden, 21 N. J. Eq. 74,* the chancellor said: "It is laid down that if a husband sees what a reasonable man could not see without alarm, he is called upon to exercise a peculiar vigilance and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result." *Delaney* v. *Delaney, 71 N. J. Eq. 246,* holds: "It is not necessary to find words or statements of the husband indicating connivance or consent. If his conduct indicates an intent, or even a willingness that the act of adultery may take place, or even culpable negligence in not preventing it, the maxim *volenti non fit injuria* applies, and the decree will be denied." See, also, *Sargent* v. *Sargent, 114 Atl. Rep. 428; White* v. *White, 95 Atl. Rep. 197; affirmed in 84 N. J. Eq. 512;* also *Rapp* v. *Rapp, supra; Young* v. *Young, supra.* Before the institution of this suit Mr. Atha left his wife, went to the home of his parents, and wrote to her that he would never thereafter live with her. His suit for divorce having failed, he must properly provide for her.

I will therefore hear counsel as to the proper amount to be allowed when the decree is advised.