FLORENCE McMILLAN v. D. W. McMILLAN.

162 So. 524.
Division B.
Opinion Filed June 25, 1935.

---

*For example: Martin v. Karel, 106 Fla. 363, 143 Sou. Rep. 317; Kirk v. Morrison, 108 Fla. 144, 146 Sou. Rep. 215.

210

*Beggs & Beggs, E. C. Maxwell* and *W. L. Spencer* (of Birmingham, Ala.) for Appellant;

*William Fisher,* for Appellee.

TERRELL, J.—August 12, 1933, appellant as complainant instituted her suit (in the Circuit Court of Escambia

County) for alimony and suit money without divorce against appellee, as defendant. August 22, 1933, appellee countered with a suit for divorce against appellant in the same Court. August 31, 1933, the Chancellor entered his decree consolidating the two causes and further decreeing that appellee's suit for divorce be the main suit, thereby placing appellant in the position of defendant and cross complainant and appellee as complainant and cross defendant.

The bill of complaint for divorce on the part of appellee was amended, a motion to strike was denied, testimony was taken before the Chancellor, and on final hearing the relief prayed for was granted. The instant appeal was prosecuted from that final decree.

Five errors are assigned and argued at length. They all turn on the question of whether or not the divorce in favor of appellee was providently granted.

The prayer for divorce was grounded on adultery. The bill of complaint in effect alleges that the defendant committed adultery with Wade H. Oldham on (1) An automobile trip from the summer home of the McMillans in Connecticut via Youngstown, Ohio, to Birmingham, Alabama, in the summer of 1931 (2) At Valparaiso Inn, Valparaiso, Florida, where they spent two or three days on or about Labor Day, 1932. (3) In November, 1932, at the Tutwiler Hotel, Birmingham, Alabama, the defendant occupying suite No. 922 where she entertained Oldham and others. (4) On January 11, 12 and 13, 1933, at the Tutwiler Hotel, Birmingham, Alabama, the defendant occupying suite No. 960 where she entertained Oldham and others. (5) On March 4, 5 and 6, 1933, at the Demopolis Inn, Demopolis, Alabama, where defendant and Oldham spent from noon, Saturday, to Monday morning in the same room. (6) On numerous occasions at Fairyland Cottage No. 8,

Fairyland, Georgia, on Lookout Mountain between June 2 and July 10, 1933. (7) On June 30, 1933, at Gadsden, Alabama, and (8) at numerous other places in Alabama and Georgia in 1932 and 1933 where defendant and Oldham made weekend trips and visits secretly.

To prove adultery the law does not require that specific acts be attested by eye witnesses. The rule approved by the weight of authority is that if the circumstances proven are such as to lead the guarded discretion of a reasonable and just man to the guilt of the participants that is sufficient. Heath v. Heath, 103 Fla. 1071, 138 So. 796; Thayer v. Thayer, 101 Mass. 111, 100 Am. Dec. 110. In Atha v. Atha, 94 N. J. E. 692, 121 Atl. 301, it was held that if desire and opportunity were proven adultery would be presumed. The following cases support the general rule: Stackhouse v. Stackhouse (N. J. E.) 36 Atl. 884; Allen v. Allen, 101 N. Y. 658, 5 N. E. 341; Houlton v. McGirk, 122 La. 359, 47 So. 681, 16 Ann. Cas. 1117; Dicus v. Dicus, 131 Md. 87, 101 Atl. 697; Willie v. Willie, 88 N. J. E. 581, 103 Atl. 74; Kerr v. Kerr, 118 N. Y. S. 801.

The evidence discloses that appellant and appellee were married in Birmingham, Alabama, in March, 1928, and soon after took up their residence in Pensacola, Florida, where they continued to reside until January 4, 1933, the date of their separation. Appellee has been a citizen of Pensacola all his life, had been a practicing physician there for many years, but was a man of means and at the time of his marriage to appellant had retired from the active practice of his profession but was engaged in other business activities.

No acts of adultery on the part of appellant with Oldham were proven by eye witnesses but from the summer of 1931 to the summer of 1933, about the time the bill for divorce was filed, a course of suspicious and surreptitious conduct

by them is so conclusively established that adultery as a deduction necessarily follows. It was proven that Oldham visited the Connecticut summer house of the McMillans in the summer of 1931 after Dr. McMillan returned to Florida, and that Mrs. McMillan returned in an automobile to Birmingham, via Youngstown, Ohio, with him. It was also proven that Oldham visited Mrs. McMillan at Elkmont, Tennessee, under suspicious circumstances in the summer of 1932. It was proven that Mrs. McMillan met Oldham at the railway station in Pensacola and drove with him fifty miles to Valparaiso where they spent two or three days at the same hotel in rooms conveniently located to each other and under questionable circumstances. The Tutwiler Hotel incidents of November, 1932, and January, 1933, were proven beyond question. It was proven that Oldham spent every weekend with Mrs. McMillan from June 2 to July 10, 1933, at Cottage No. 8, Fairyland, Lookout Mountain, that they played golf together, that he was introduced there and was known as Mrs. McMillan's husband, and that they spent the nights in the same cottage and in the same bedroom. It was proven that they spent the night of June 30 at the Reich Hotel in Gadsden, Alabama, registered under assumed names, and had rooms on the same floor in close proximity. It was proven that they met by appointment at Demopolis, Alabama, registered at the Demopolis Inn under assumed names, and stayed there from noon Saturday until early Monday in the same room with only one bed, and had all their meals served in the room. During all these intervals they were passing letters frequently and their conduct was in other respects such as to excite suspicion.

Appellant and Oldham took the stand and attempted an explanation of all these escapades and denied positively that any illicit relations were engaged in by them. Their ex-

planation or denial is of course not beyond the realm of the possible but it was blatant assault on approved moral standards. Their conduct may have been the flower of one of those platonic friendship affairs that are said to generate in certain levels of the social strata but are unknown to those patterns of social relations that gave rise to the rule of law announced and approved in this opinion. The Chancellor did not believe their story and since his decree finds ample support in the record we feel constrained to let it stand.

But appellant contends that even though appellee proved adultery he cannot prevail in this suit because he is guilty of conniving at all he charges against her and joined in a conspiracy to force appellant from his home. Appellant also pleads justification and recrimination and charges that appellee did not approach the court with clean hands.

The general rule is that to constitute a defense by recrimination the misconduct that defendant charges complainant with must be such that if proven will afford defendant a ground for divorce. Has Mrs. McMillan charged and proven as required by the rule in this case? Chisholm v. Chisholm, 105 Fla. 402, 141 So. 302; Krasnow v. Krasnow, 280 Mass. 252, 182 N. E. 338; Tebbe v. Tebbe, 223 Mo. App. 1106, 21 S. W. (2nd) 915; Roberts v. Roberts, 204 Wis. 401, 236 N. W. 135; Carmichael v. Carmichael, 106 Ore. 198, 211 Pac. 916; McCannon v. McCannon, 73 Vt. 147, 50 Atl. 759; Reeves v. Reeves, 106 N. J. E. 532; 51 Atl. 474, 19 C. J. 94.

To connive at means to feign ignorance of, to wink at, to pretend not to know, to covertly approve by passive conduct. If forced upon her, adultery on the part of the wife does not constitute ground for divorce, neither can the husband claim a divorce on the ground of adultery when

his conduct conduced to or aided it. Neglect of the husband to provide support for his wife or in any manner to concern himself about her may constitute misconduct conducing to her adultery but the mere fact of living apart is no justification for it. 10 C. J. 77, par. 172.

. In 19 C. J. 91, it is pointed out that mere passive permission or misconduct does not make the party giving the permission guilty of connivance if he does nothing to encourage the other to commit the offense, and does not directly or indirectly throw opportunities therefor in the way. Connivance will not be implied from mere negligence, folly, dullness of apprehension, or indifference; nor as a rule can connivance be implied from desertion, though under some circumstances it may be.

In Wilson v. Wilson, 154 Mass. 194, 28 N. E. 167, it was held that the fact that a husband suspects his wife of infidelity, watches her for the purpose of obtaining proof of it, and stands by and sees her go with another man, is not sufficient to support a charge of connivance, although he in fact wishes her to commit adultery in order that he may obtain a divorce. Herriford v. Herriford, 169 Mo. App. 641, 155 S. W. 855; Farwell v. Farwell, 47 Mont. 574, 133 Pac. 958; Puth v. Zimbleman, 99 Ia. 641, 68 N. W. 895.

The record discloses that Mrs. McMillan commenced making clandestine engagements with Oldham and meeting him secretly at different places long prior to her separation from Dr. McMillan and that such engagements continued up to the time the bill for divorce was filed. There is no showing that Dr. McMillan knew of any of these engagements at the time or that he in any way aided or encouraged them. It is not shown that Dr. McMillan was endowed with the power of prevision or that he had any means of forestalling his wife's conduct. He continued to

support his wife until July, 1933, and we find proof of no conduct on his part justifying or conducing to his wife's adultery. True, it is shown that Oldham was frequently entertained in the McMillan home and that Dr. McMillan treated him with kindness and consideration. It is also shown that Dr. McMillan encouraged his wife to go to Birmingham in January, 1933, but for the purpose of assisting in the concert for the blind. The record is dearth of any showing that he knew of or intended to encourage his wife in her contacts with her paramour.

In support of her contention appellant also relies on White v. White, 84 N. J. E. 512, 95 Atl. 197, and Atha v. Atha, 94 N. J. E. 692, 121 Atl. 301. Both these cases have been examined but neither is in point with the case at bar. The White case turned on an interpretation of the New Jersey statute forbidding a divorce for adultery if it be shown that the party applying for it consented thereto. It was there held that if a husband sees his wife in danger, if he sees her in a position where she is likely to become subject to the power of the blandishments of a man whose character he knows to be bad and intentions evil, and he does nothing to warn her or to withhold her from his hands, but allows her to be led to her ruin and his dishonor, his conduct in law amounts to consent.

In the Atha case it was held that in a suit for divorce where the evidence showed adultery by the wife, evidence that the husband knew of the intimacy between his wife and co-respondent and of their opportunities together, and nevertheless remained on friendly terms with the co-respondent, held to show that the husband had condoned, connived, and acquiesced in the adultery, so that he was not entitled to a divorce on that ground.

The court also approved the general rule in the Atha case

to the effect that a husband seeking divorce for his wife's adultery must come into court with clean hands, and he cannot acquiesce in conduct by his wife which will inevitably result in her downfall and condone her intimate relations with her paramour, and thereafter obtain a divorce on the ground of her infidelity which he made no effort to prevent. Delaney v. Delaney, 71 N. J. E. 246, 65 Atl. 217.

Tht conspiracy charge against appellee is grounded on these essential facts: In March, 1929, Dr. McMillan created a trust wherein in addition to certain legacies and life bequests for the benefit of some of his relatives and friends he provided that Mrs. McMillan should have paid her from the income of the trust estate One Thousand Dollars per month for her life or so long as she continued to be his widow, the remainder to be divided eventually between the Masonic Lodges at Pensacola and Brewton, Alabama. He designated his cousin, Ed. Leigh McMillan of Brewton, Alabama, and others to administer the trust.

Early in January, 1933, Mrs. McMillan and her daughter, Annette Woods, went to Birmingham to assist in giving a benefit concert for the blind. Soon after arriving in Birmingham and registering at the Tutwiler Hotel, Mrs. McMillan discovered that she was being shadowed by detectives and complained to Dr. McMillan who assured her that he knew nothing of it and wrote her the following letter:

"My dear Florence:

"Your letter is a great surprise to me.

"Your suspicions I am sure, are quite unfounded. Ed Leigh being in the hotel is purely incidental. Your imagination is playing tricks with you. Forget it all and concentrate on the concert. I hope you will meet with great success. No people are more deserving than the blind.

"Everything is going on very well. Had lots of rain yesterday and last night.

"I wrote Mr. Fraser about climbing fig to be put on the east, west, and south sides of the house. Virginia Creeper on the north side.

"I am enclosing a letter from Mrs. Zogbaum.

"Ann is behaving beautifully. I flatter myself that I can control her better than you or Annette.

"Love, D."

It appears from the record that Mrs. McMillan's son-in-law, Charles G. (Shay) Woods, had suspicioned his wife of unfaithful conduct and had employed detectives to shadow both his wife and mother-in-law on the Birmingham trip. Some days after (the record is not clear how many) the letter as above quoted was written, Dr. McMillan wrote Woods the following letter:

"My dear Shay:

"You must not forget to smash them thoroughly.

"Remember that Florence in ordering the kidnaping of the baby is guilty of a Federal offense. Bring the charge against her along with the charge against Annette.

"Remember the more smashing the blow the more quickly she will vanish. I want above all things for her to leave Pensacola forever.

"Please remember the caution I gave you. Make a previous appointment with Wentworth. Get his house address and come in there after dark and go directly to his residence and strike as quickly as you can.

"Do not forget to bring the charge against F. for kidnaping the minute you get charge of the baby, go after Taylor and then F.

"Write me care Ed Leigh——Brewton, the minute you

get custody of the baby, or rather wait until the next day as I want to hear the ........................? reaction of the public. I am particularly anxious to have the reaction of................?, Reilly, Mr. Green, and Mr. and Mrs. Shine. Send me the account of the trial in the newspapers. Describe the trial and say if the public hear it and the defense of Annette.

"How did ..................... act?

"Get in touch with Wentworth and if you can pull the case off Friday, do so. Remember Annette does not have to be ....................? The judge can make the decision on the spot without waiting thirty days.

"Give F. a good talking to. She has abused you much. Give her the works. Tell her about Agg................ and Annette. I think Regina is off also.

"Do not fail to bring the charge against F. Hide the Lincoln and hide yourself and baby. Do not leave your place until dark.

"Go to Wentworth's home after dark. Keep them in the dark until the day of the trial. Not being able to locate you burns them up.

"Yours, D."

It is contended by appellant that these two letters, written about a week apart, show a complete and abrupt change of attitude on the part of Dr. McMillan toward his wife and that as a result of this change he became her implacable foe, hounded her through two states with detectives of questionable character, withdrew from and refused to live longer with her or to support her, besmirched her character, and left her penniless and without any means of support. It is further contended that such treatment led to appellant's humiliation, that the acts relied on for divorce accrued during her humiliation after the second letter was written

and after appellee deserted appellant, for which equity will not permit him to be divorced from her.

On their face these letters show that a change had come over Dr. McMillan's attitude toward his wife but the mere fact that it came about in a week or thereabouts is not material. For the reason of adultery one spouse could change his or her attitude toward the other in much less time than that and the record in this case would warrant it. At the time the second letter was written the Connecticut summer home incident had taken place, the Valparaiso incident had taken place, the November, 1932, incident at the Tutwiler Hotel had taken place, and the January, 1933, incident at the Tutwiler Hotel was in progress. These incidents or any of them when related to an old fashioned gentleman were quite enough to make him explode.

It is quite true that a husband cannot prevail in a suit for divorce on the ground of adultery if the desertion took place before the adultery and the latter was induced from destitution resulting from the desertion. This rule can avail appellant nothing because the suit for divorce was brought in August, 1933, and it is shown that appellee contributed amply to the support of appellant until July, 1933, and every incident pointing to adultery took place prior to this time.

The question of connivance, recrimination, and justification are all intermingled and while we have treated them separately what has been said as to one applies generally to the other. Much of the evidence is challenged on the ground that it comes from hired servants and witnesses whose word is not credible. Whether there is much or nothing to this challenge there is ample evidence in the record which is not challenged to support the charge and a significant fact is that much of the challenged evidence is

corroborated by and proven by that which is not challenged.

Other questions raised relate to the rejection of proffered evidence by defendant, the sustaining of objections to interrogatories propounded to Dr. McMillan, and the refusal of the Chancellor to allow appellant ample time to prepare for trial. We have examined all these assignments but fail to find reversible error.

The record has been carefully examined and we fail to find any support for appellant's defense on the ground of recrimination, justification, or connivance. When it dawned on Dr. McMillan that his wife was playing "fast and loose" with him he left at once and while he continued her support he set about getting evidence to prove his case and while the strongest evidence secured was with relation to acts that took place after the separation it is connected with that of acts that preceded the separation which point conclusively to guilt. We have searched diligently and we fail to find anything in his quest for proof or in his relations with Ed. Leigh McMillan or Woods that point to a conspiracy to embarrass or humiliate his wife or to force her out of his home.

The judgment is accordingly affirmed.

Affirmed.

ELLIS, P. J., and BUFORD, J., concur.

WHITFIELD, C. J., and BROWN and DAVIS, J. J., concur in the opinion and judgment.