**BESSIE MAE ENGEBRETSEN v. TOLEY ENGEBRETSEN**

11 So. (2nd) 322                En Banc
March 24, 1942         On Rehearing December 18, 1942

C. D. Abbott, for appellant.

Liddon & Fee and Arthur R. Clonts, for appellee.

CHAPMAN, J.:

From a final decree entered by the Circuit Court of Martin County, Florida, granting plaintiff below a divorce on the ground of adultery and awarding to

him the custody of their two children, ages eight and eleven, respectively, with the privilege of visitation to the mother, defendant below, an appeal has been per-fected here. The plaintiff husband charged his wife with adultery and extreme cruelty, which by an appropriate answer the defendant wife denied. The wife defendant in a counter claim charged her husband with extreme cruelty, which was denied in an answer thereto. The chancellor, on final hearing after hearing all the testimony, concluded that the plaintiff below failed to establish his charge of extreme cruelty against the wife, and that the wife likewise failed to carry the burden of proof by establishing extreme cruelty on the part of the husband, and dismissed her counter claim. It is here contended that the evidence adduced by her in support of the charge of extreme cruelty on the part of the husband overwhelmingly sustains the said allegations thereof. It is necessary to examine the testimony to determine this controverted issue.

The testimony discloses that the plaintiff below, Toley Engebretsen, by birth is a Norwegian. His first wife died and left one child. On August 17, 1927, he married the appellant in Jacksonville, Florida. She, at the date of their marriage, was approximately 20 years of age, while her husband was about 28. He at the time was an employee of the Arundel Corporation and stationed at Salerno, a small community located three miles south of Stuart, in Martin County, Florida. The parties went to live some three miles in the country and west of Salerno. The appellant discharged the duties of a wife, inclusive of feeding, milking and caring for the cows, as well as chickens and ducks, and generously contributed her labor to

the upkeep of the country home. The appellee's son by a former marriage was taken into the home and cared for by the appellant, as the appellee's employment took him from home during the day time.

It is not clear from the record that the appellant in addition to her household duties, discharged the family weekly washing, but it is clear that in the early days of her married life but little, if any, help in the household duties was required or demanded by the wife or supplied by the husband. About one year after marriage a son was born. Her confinement resulted in the loss of only two or three days from household duties. This was her only illness at that time subsequent to her marriage. The plaintiff below resigned his position with the Arundel Corporation and immediately opened a small marine hardware business at Salerno. He ran also a repair business and did not return to his home for the noon meal. He was thrifty and industrious; carried out fishing parties, and owned and operated suitable fishing boats, which provided splendid revenues. It is shown that when this suit was filed he owned six or seven fishing boats and his daily income, frequently, was from $100.00 to $150.00 per day. They accumulated money and property rapidly.

The wife, appellant here, after her home duties were dispatched, would go from her home to Salerno and there work in the store, booking fishing parties, waited on trade and attend to other assignments incidental to the business, and would leave Salerno in the afternoon and return to her home, pen and milk the cows, feed the chickens and ducks and do other chores, and then prepare the evening meal for the family. The husband would continue his labors until

dark, close the busines and go home some three miles in the country. The husband studied aviation and learned to control a plane, and had an agency or some planes for sale about his business at Salerno. An apartment was constructed above the garage and the family moved from the country in about 1929 or 1930 to the apartment at Salerno. A long flight of steps lead from the ground to the home or apartment built over the garage. The wife continued all her household duties and in addition worked in the store and cared for a considerable portion of the trade about the business. The husband frequently would be away on fishing parties and customers at the business would call, ring a bell, and the appellant would cease her household duties and go to the store and accommodate them.

When the parties were struggling to get ahead in a financial way, they were happy and contented. Wealth, accumulations and prosperity, according to the wife, brought trouble, disagreements, personal clashes, violence, and ultimately the filing of this suit. She stated that her husband just couldn't accumulate money without it affecting his head. He often would become angry with some one about the place and would go upstairs and strike, beat and abuse her. When she was carrying her second child and two or three days prior to its birth, her husband threw her down the steep steps leading from the garage apartment and inflicted a blow or wound over the lower part of her breast bone. The attending physician testified about the tenderness at this point in her breast upon the birth of her child, and testified that some five or six years thereafter there was a tenderness in her breast near the same place, but he could not state

whether it was chronic or not. The wife testified that she has suffered pain continuously since he threw her down the long flight of steps leading from the ground to their apartment. This is not contradicted.

The record shows violence to the wife by the husband viz.: (1) in February or March, 1939, the husband beat her, knocked her down and threw her about the garage. Her eye was blacked and left a scar; (2) shortly thereafter he accused her of meeting some one on the corner and beat her again; (3) on June 8, 1939, she attended, with his approval, a beach party and on returning home the door was locked but she managed to gain admittance, when he beat and threw her down the apartment steps; (4) she went to Fort Pierce one night in December, 1939, and on her return he struck and beat her, knocked her down, applied unspeakable epithets, and one of the blows from his fist struck her in the mouth, knocking out a tooth and rendering her unconscious for a short time. He threatened to kill her; (5) the following night he assaulted her, threw a gun on her and threatened to shoot her; he threw her out of their home in the nighttime and would not let her re-enter; she slept in the truck in the garage during the night; the following morning she cooked breakfast, when he again cursed, abused and threatened her life; (6) he wanted her signature to get money on deposit in her name and when she refused, he cursed, threatened and abused her and drawing a pistol on her again threatened to kill her; (7) on December 13, 1939, he would not let her enter his home and she was forced to sleep in the truck in the garage under the apartment; (8) the next night she entered the home in the appellee's absence and went to bed and on his

return he found her and drew a pistol on her and said: "Didn't I tell you not to come in this house or I would kill you?" "and he then opened the door and threw me out of the door down the long flight of steps and I fell on some boxes. He locked the door to his car and I could not get in it and had to sleep in the truck"; (9) while he had given her some money, she had left it in the home and he would not give it to her or let her stay in her home and she was locked out of her home and was without money; (10) she wanted to see her children and in going to see them he would meet her, curse and abuse her and pointed a gun at her and threatened to shoot her; (11) she went to see her children and appellee told her; "Didn't I tell you I was going to kill you if you ever put foot on this land again?" and she told him: "I came here to see the children. He threw a shot gun on me and his oldest son beat me while his father held the gun on me. I ran and as I did he fired one shot at me." (12) "The appellant and his son caught me, threw me in a car and Ted Preston drove while they held and beat me, and DeLoach got in the car and they took me to jail at Stuart;" (13) "Appellee beat me repeatedly while my stepson held me on the way from Salerno to Stuart, and he had a shot gun in the car near his hand while beating and taking me to jail; (14) he put me in jail at Stuart because I went to our home to see my children; (14) he tried to pull the rings off my fingers; he called me vile and vulgar names and spat in my face;" (16) they placed her in jail and while she was in a cell the appellee again cursed, abused, threatened to kill and called her vile and filthy names; (17) she was placed in jail without a warrant because she went to her home to see her children contrary to

the views of her husband; (18) the husband weighed 180 pounds and, armed with a shot gun and aided by his son and two men, placed the appellant in a car and took and placed her in jail at Stuart; (19) appellant went to Dr. Parker for treatment and he testified that on examination he fond several blue spots on her body and limbs; (20) she complained of tenderness over the lower part of her breast bone and he bandaged her for the chest pain; (21) she was examined in September, 1940, by two doctors for a return of the chest pain; (22) she had had a continuous menstrual flow since the previous December, 1939; her body disclosed clear and positive marks of violence applied by the appellee and by him admitted; (23) the appellant was taken into custody and placed in jail on a peace warrant later issued by a Justice of the Peace. The husband was afraid the appellant would take his life and criminal process for the appellee issued. He and his son armed with a shot gun, aided by DeLoach, a material witness for the appellee, and Preston placed the dangerous 118 pound woman in jail. The appellant testified as above stated, and her testimony is strongly and minutely corroborated by the physician attending her. Some of the testimony is not denied, and violence toward the appellant on the part of the appellee is admitted, viz.:

"Q. Do you know how she got the black eye? A. I think I do, yes. Q. You do? Did you hear this witness testify he heard that you had some trouble down there? A. Yes, sir. Q. You didn't have any trouble? Yes, sir. Q. You and Mrs. Engebretsen did? A. Yes, sir. Q. What trouble did you have A. I think that is the time that she ran after the boy and I tried to put her back up the stairs. Q. February, 1939? A. I

am not sure that is the time. We did have trouble on one other occasion when you get to it. Q. When you wanted to put her back upstairs, you took hold of her by force, didn't you, to put her back upstairs? A. I thought it was my duty to keep her from running out and making a fool of herself before the public. Q. Did you think it was your duty to take hold of your wife and chastise her, throw her out and put her upstairs and downstairs any time that you see fit? A. No, sir. Q. If your wife went away from home or she wasn't as congenial as she could have been, do you think it could have been accounted for by the fact that you had used physical force on her at those different times? A. Well, when I had to use physical force, it was usually some trouble that started from herself. Q. And you didn't hesitate to use physical force on her at anytime when you thought it was necessary? A. I wouldn't say that. I wouldn't say that; I hesitated hundreds of times. Q. But other times you didn't hesitate? A. A man can only stand so much; probably you know it? A. About how much would your wife weigh, do you know? A. Well, it all depends on a man's temper, of course."

"Q. What happened the next day: the next day was the 13th, that was Wednesday. A. Well, had my business to attend to and I had to get down in the morning and get things started. She got the children off to school and after they got gone, I run up there between work and tried to get her to: 'Let's us get ready to go to town.' She wouldn't say anything and wouldn't go. Well, that evening the boats brought on a lot of Kingfish, and when they do, I usually contract it among friends and send the fish to fishing parties. I wrapped each one of the fish separately and put them

in my car. And I went up and told her before I left that it was no use her staying in my house any longer, I wasn't going to put up with it and that when I come back I expected her to be gone. I wasn't going to let her sleep there that night. I come to town and contracted the fish, went back home, found the children in bed and she was gone. But on the dresser I found a note; and after reading the note, I figured that she had just left as I expected her to do. Q. Now, she was not there the night of the thirteenth? A. No, sir. Q. Now, she brought Toley, Jr., back with her the night of the twelfth when she came home? A. Yes, sir. Q. Where was the little girl? A. She was with some of her friends at Salerno—spent the night. Q. And did she take the little boy with her to Fort Pierce where she told you she had gone that night? A. No, he told me he went to the picture show and waited outside the show for over an hour before they come along to pick him up after the show. Q. Then, what happened on Thursday? A. . . . And so I had gone down to work to see different people who wanted to see me. And on one occasion, she came down in the shop and wanted to help. And as soon as the customers left the shop, I pushed her in front of me to the door downstairs and told her to get out, that I didn't want her to bother with any of my business or want her to stay at my home any longer. So she left; that was about two o'clock in the afternoon. . . . Q. Tell what happened there. A. I told her before, I didn't want her to sleep under my roof any more. And I went in and woke her up and when I woke her up, I told her that she couldn't stay there any longer. And she said, 'Well, I have just as much right in this house as you have because I had the sheriff down here

and he told me to stay here.' I said, 'Well,, I am sorry, but I am not going to have you in this house any longer, the way you have been doing.' So I attempted to put her out peaceably. She put up a struggle, didn't want to get out, and I got hold of her behind her shoulders in her clothes and walked down the stairway, opened the door and held her with one hand, opened the door with the other—and set her outside the door and shut the door and locked the door. Q. Now, was that the last time she came back? A. That is the last time she came back when I was there, but she came back on Friday when I wasn't there. Q. And have you been separated ever since? A. Yes, sir." . . . "Q. Engebretsen, the man, DeLoach, who testified in this case here, is he one of the same men who helped take your wife to jail A. Yes, sir. Q. What made you take your wife to the jail and throw her in, Engebretsen? A. Well, I figured it was safer for her and me both, the way things were going, it had to be an end to it somewhere. And I figured if I got it to a head somehow, both of us would be safer. She was running around trying to make all kinds of trouble and I was trying to hold her down if it was any possible way. . . . Q. How many of you men was there took her and put her in the jail and carried her to jail? A. I put her in the car, myself. Q. Who else was in there? A. There was nobody in there when I put her in there. Q. You had this boy, Edward, in there? Wasn't he? A. I asked him to get in when we left. Q. Did he grab and help hold? A. No, sir, he was sitting on one side, I was sitting in the middle and she was on the other side. (Indicating) Q. Did you have a rifle there? A. Yes, sir. Q. What did you have the rifle there for? A. For protection. Q. You had

to have—you four men had to have this rifle for protection against this woman? A. I was only by myself when I first met the woman. Q. Didn't she come to the house and weren't these men all right there? A. No, sir, they wasn't there. Q. Where was the boy? A. He was in the house. Q. Didn't he grab her? A. No, sir. Q. He didn't grab her? A. No, sir. Q. Who grabbed her? A. I did. Q. Did you shoot off the gun? You shot at her? A. We got in a struggle with the gun and it went off. Q. How did the gun happen to go off? A. Well, I guess somebody must have got hold of the trigger. Q. It couldn't shoot unless it was an automatic gun? A. Yes, sir. Q. What kind of a gun was it? A. A Winchester Rifle. Q. What kind of a Winchester? A. I don't know. Q. A lever action? You throw it out from underneath? A. Throw it out from underneath. Q. Then you would have to cock it, wouldn't you? A. Yes, sir. Q. Who cocked it? I did. Q. So you met your wife with a cocked rifle when she came there? A. Yes, sir. . . ."

If the court has jurisdiction of the parties and the subject matter of the litigation, and the evidence shows the existence of the ground for divorce and it is one recognized by the statute and no other lawful reason exists why a divorce should not be granted, it then becomes the duty of the court to grant the decree. See Mitchell v. Mitchell, 91 Fla. 427, 107 So. 630. Divorce should be granted on positive uncontroverted testimony, legally sufficient to sustain the allegations of the bill warranting divorce where not impeached or directly contradicted. See Plowman v. Plowman, 101 Fla. 641, 135 So. 125; Nolen v. Nolen, 121 Fla. 130, 163 So. 401. The evidence clearly es-

tablished the allegations of extreme cruelty. The order dismissing her counter claim was erroneous.

Appellant here contends that the testimony adduced by the plaintiff below was legally insufficient to establish adultery as alleged in the bill of complaint and denied by her answer. This burden, as a matter of law, rested on the plaintiff below. See Shippey v. Shippey, 97 Fla. 881, 122 So. 272. Adultery is seldom or rarely established by direct testimony. The natural secrecy of the act makes or ordinarily renders it impossible to establish it except by circumstantial evidence. The facts and circumstances as disclosed by the evidence supporting the charge of adultery in a divorce proceeding must be such as to lead the guarded discretions of a reasonable and just man to the conclusion that adultery was committed. When considering facts and circumstances adduced in support of the charge of adultery, great care is necessary, so as not to be misled by facts and circumstances capable of two interpretations by giving them an evil rather than an innocent one; or by refusing to give them their plain and natural significance on the theory that a different standard applies to such cases from other ordinary transactions. The facts and circumstances adduced must be considered separate and as a whole and a conscientious conclusion reached similar to other litigated cases.

In the case of McMillan v. McMillan, 120 Fla. 209, 162 So. 524, the rule, supra, was enunciated by this Court when we said:

"To prove adultery the law does not require that specific acts be attested by eye witnesses. The rule approved by the weight of authority is that if the circumstances proven are such as to lead the guarded

discretion of a reasonable and just man to the guilt of the participants that is sufficient. Heath v. Heath, 103 Fla. 1071, 138 So. 796; Thayer v. Thayer, 101 Mass. 111, 100 Am. Dec. 110. In Atha v. Atha, 94 N. J. E. 692, 121 Atl. 301, it was held that if desire and opportunity were proven adultery would be presumed. The following cases support the general rule: Stackhouse v. Stackhouse, (N.J.E.) 36 Atl. 884; Allen v. Allen, 101 N. Y. 658, N. E. 341; Houlton v. McGirk, 122 La. 359, 47 So. 681, 16 Ann. Cas. 1117; Dicus v. Dicus, 131 Md. 87, 101 Atl. 697; Willie v. Willie, 88 N.J.E. 581, 103 Atl. 74; Kerr v. Kerr, 118 N.Y.S. 801."

The evidence largely relied upon to support the charge was given by W. H. Strickland and his son-in-law and daughter; Lee DeLoach and Sadie DeLoach. About dark December 11, 1939, they testified that the appellant got in a Ford car with Audley Hires near the DeLoach fish house at Salerno. The two men testified that the appellant and Hires drove *south* through the town, passing near appellee's place of business. The two men in a car immediately followed them, and traveling on a different road, passed them when the two roads converged and they recognized the appellant and Hires as their car passed them; that they crossed a bridge, turned left, and entered a dead end street, traveled a short distance and stopped. The two witnesses saw the car stop and the appellant and Hires got out of the car, walked a few feet therefrom and stayed about twenty minutes and returned to the car. The two witnesses did not see the parties in the act of intercourse. The distance between the two witnesses and the parties at the time is estimated at between 60 and 70 yards, and at the time it was dark. W. H. Strickland testified that the moon was shining

and was above the tree tops. Lee DeLoach testified that it was dark but he could see them. The parties were seen frequently together. Sadie DeLoach testified that Hires and appellant when leaving the fish house drove *north* or west when followed by her father and husband and that they did not go south.

The appellant, with her eleven year old son, and Hires admitted leaving the fish house in a Ford car, but testified they went directly north therefrom to Stuart, a distance of three miles, and the son went to a show; that Carl Wilkerson, at Stuart, got in the car and rode with the parties to Fort Pierce and the appellant called at the home of her sister. The three returned to Stuart and the boy came from the show and got in the car. The witness Carl Wilkerson observed no improper decorum between the parties. Appellant and Hires denied the testimony of Strickland and DeLoach. The eleven year old son testified.

Appearing in the record are several kodak pictures of appellant and W. A. Hires offered by the plaintiff below. The bill of complaint charged the appellant with extreme cruelty and adultery with W. A. Hires. It is difficult to appreciate the relevancy and materiality of these several pictures when offered in support of the allegations of adultery or extreme cruelty. The brief of counsel for appellee fails to discuss the same. The pictures were made at Pahokee when appellant was visiting her brother. W. A. Hires married appellant's sister and was employed at Pahokee at the time. She took them home; they were observed by her husband, or could have been observed, as the same were kept in the bedroom of the parties to this suit. Appellee accentuated their importance for the first time as evidence only after the institution

of his suit. The pictures do not establish the charge of extreme cruelty nor the charge of adultery. It is possible that individuals possessing abnormally high standards of morality would condemn as unwise and indiscreet the posing for pictures by a young married woman with her brother-in-law, but the standards of conduct change with each generation. Short skirts, the exposure of lower limbs beautifully adorned with silk hose, and during the summer months made more attractive by the total elimination thereof, shoes so designed as to display daintily polished toe nails, the modern "make up" acquired at a beauty salon, the elegant cigarette case, double dating, early and late dates, necking, and modern methods of love making were each but a little short of les majeste to the writer's generation.

In the case of Heath v. Heath, 103 Fla. 1071, 138 So. 796, 82 A.L.R. 537, the sufficiency of the evidence to sustain the charge of adultery against the wife was presented. The husband and two disinterested witnesses testified that the wife was lying on her bed, clothed·in her underwear and draped with a bathrobe. Her paramour was lying on the bed beside her with his shoes and coat off. These facts and circumstances established the guilt of the wife. The wife's explanation of the predicament was that her paramour was there to obtain from her a letter of recommendation to assist him in obtaining employment was by the court rejected.

In the case of McMillan v. McMillan, *supra,* (120 Fla. 209, 162 So. 524) the sufficiency of the testimony to sustain the charge of adultery was presented and it was held that the charge was sustained. The facts are viz.: .

". . . It was proven that Oldham visited the Connecticut summer house of the McMillans in the summer of 1931 after Dr. McMillan returned to Florida, and that Mrs. McMillan returned in an automobile to Birmingham, via Youngstown, Ohio, with him. It was also proven that Oldham visited Mrs. McMillan at Elkmont, Tennessee, under suspicious circumstances in the summer of 1932. It was proven that Mrs. McMillan met Oldham at the railway station in Pensacola and drove with him fifty miles to Valparaiso where they spent two or three days at the same hotel in rooms conveniently located to each other and under questionable circumstances. The Tutwilder Hotel incidents of November, 1932, and January, 1933, were proven beyond question. It was proven that Oldham spent every weekend with Mrs. McMillan from June 2 to July 10, 1933, at Cottage No. 8, Fairyland, Lookout Mountain, that they played golf together, that he was introduced there and was known as Mrs. McMillan's husband, and that they spent the nights in the same cottage and in the same bedroom. It was proven that they spent the night of June 30 at the Reich Hotel in Gadsden, Alabama, registered under assumed names, and had rooms on the same floor in close proximity. It was proven that they met by appointment at Demopolis, Alabama, registered at the Demopolis Inn under assumed names, and stayed there from noon Saturday until early Monday in the same room with only one bed, and had all their meals served in the room. During all these intervals they were passing letters frequently and their conduct was in other respects such as to excite suspicion."

See Crews v. Crews, 130 Fla. 499, 178 So. 139.

It is our conclusion, after a careful review of all the testimony offered in support of the adultery charge, that the plaintiff below (appellee here) failed to sustain the material allegations of the bill of complaint. The burden by law was cast upon him, but he failed or omitted to carry that burden. The episode at the dead end street, as testified to by DeLoach and Strickland, if considered at its face value, fails and falls short of the law's requirements. It at the most presented an opportunity and created a suspicion that adultery was committed. This is insufficient. The testimony of these two witnesses was materially discredited by the testimony of Sadie DeLoach, Wilkerson, appellee, Hires, and the eleven year old son, and corroborating circumstances. The facts and circumstances adduced in support of the charge of adultery, when considered separate and as a whole, fall short of the approved standards enumerated by this Court in Heath v. Heath, *supra,* and McMillan v. McMillan, *supra.*

It is suggested that the chancellor below personally received the evidence, heard the witnesses testify, and observed their demeanor when on the stand, and that the conclusions by him reached should not here be disturbed, in the absence of a showing of abuse of discretion and that this rule is here controlling. The answer to this contention is that the rule contended for is not applicable. The question is the sufficiency of the testimony to support the allegations of adultery appearing in the bill of complaint and not the conflicts and disputes appearing in the testimony alleged to be settled by the terms of the decree.

The evidence discloses that the appellant soon after marriage assumed the menial duties of daily feeding

and milking the cows, caring for the chickens about the place, doing all of her cooking, washing, ironing and other household work, and in addition thereto took on the responsibility of rearing appellee's child by a former marriage then four years of age. There was no aid or assistance rendered appellant by the appellee in these many daily duties or hired help supplied by him. The appellant, after the business was launched at Salerno, went from her home and worked daily in the business. They later moved to Salerno where she continued the aforesaid duties. The business and its growth made heavy demands on her time. She contacted fishing parties, cared for and managed the entire business during many periods of time appellee would be away with fishing parties. She testified that it was her agreement with her husband that she was owner of one-half of the business. The decree permitted her only $2500.00 as compensation for services rendered from August, 1927, until December, 1939, when appellee, late at night, took appellant to the door, shoved her out and then locked the door. She slept two or three nights in the truck then in the garage. When a wife contributes her industry and labor, or when she advances money to a business operated by her husband during coverture, she cannot be deprived of her property, because the law will not permit or allow a forfeiture thereof to the husband when marital difficulties appear on the horizon, but the fruits of her labor and industry, or the money advanced, are special equities for adjudication. See Carlton v. Carlton, 78 Fla. 252, 83 So. 87; Taylor v. Taylor, 100 Fla. 1009, 130 So. 713; Heath v. Heath, 103 Fla. 1071, 138 So. 796; Windham v. Windham,

144 Fla. 563, 198 So. 202; Strauss v. Strauss, 148 Fla. 23, 3 So. (2nd) 727.

The record discloses the accumulation of considerable property by the parties since the launching of the business at Salerno in 1929 or 1930. It consists of a machine shop, tools and equipment, a marine hardware store and stock, two or three automobiles, a garage apartment, two or three houses, six or seven fishing boats, money on deposit at banks and post office, as well as other property. The several boats were used to carry out fishing parties and were productive of a large daily income. The appellant contributed her industry and labor for a period of ten or twelve years in assisting and helping in the acquisition of these several properties. The decree assigned as error permitted appellant to retain the sum of $2500.00 then on deposit in her name. The appellee sought the aid of a court of equity for the adjudication of his marital differences. One maxim of equity is that a litigant going into equity must go with clean hands, and another is that he who seeks equity must do equity. Equity will not permit or allow appellee to retain the fruits of the industry and labor of his wife over a period of ten or twelve years on the theory that it is forfeited to him because she is guilty of adultery. The appellee while seeking equity must do equity and in so doing is required to surrender the possession and control to the appellant of two-fifths value of all the real and personal property, inclusive of money owned or appearing in his name or by him placed in the name of others, as of December 16, 1939, same being the date he drove appellant from his home to sleep in the truck. The $2500.00 previously received by appellant shall be taken into account. It

cannot be denied, as shown by the record, that appellant's labor and industry for many years were large contributing factors to the accumulation of this property.

The evidences offered to show a bad reputation and unfitness of the appellant to be awarded the custody of her children has been examined and it largely consists of community gossip, prejudice, and hearsay testimony and is legally insufficient to support a decree depriving her of the custody thereof if the lower court should conclude, after hearing testimony, that the welfare of the children require an award to their mother.

That part of the final decree dated November 4, 1940, granting a divorce to Toley Engebretsen from his wife Bessie Mae Engebretsen, on the charge of adultery on her part is hereby reversed. That part of the final decree holding that Bessie Mae Engebretsen failed to sustain by competent testimony her charges of extreme cruelty against Toley Engebretsen is reversed, with directions to the chancellor below that a decree of divorce be made and entered in her behalf against her husband, Toley Engebretsen on the charge of extreme cruelty. That part of the final decree denying alimony to Bessie Mae Engebretsen is hereby reversed. That part of the final decree awarding the custody of the two children to Toley Engebretsen is reversed, with directions to the chancellor below to hear testimony and enter an order awarding the custody of the children either to the father or mother, according to their best interest and welfare, and in so doing Bessie Mae Engebretsen be considered and recognized as a fit and suitable person to whom the children may be awarded. That Toley Engebretsen be ordered or required to pay monthly,

or more often if necessary, such sums or amounts as may be decreed for the support, care and maintenance of their two minor children. All costs incident to this appeal shall be paid by Toley Engebretsen.

The decree appealed from is hereby affirmed in part and reversed in part.

It is so ordered.

BROWN, C. J., WHITFIELD, TERRELL and THOMAS, JJ., concur.

BUFORD, J., concurs in part and dissents in part.

ADAMS, J., disqualified.

BUFORD, J., concurring in part and dissenting in part:

I concur in that part of the opinion prepared by Mr. Justice CHAPMAN insofar as it deals with the counter-claim of appellant which was dismissed by the court below.

It appears to me that there is sufficient material and legal evidence in the record to support the finding of the chancellor that appellant was guilty of adultery. It was the duty of the chancellor to weigh the evidence and the credibility of the witnesses and in this regard the appellate court may not substitute its judgment for that of the chancellor.

The sustaining of the counter-claim could be of no benefit to appellant if the decree of divorce on the ground of adultery is to be affirmed.

So, I think, the decree should be affirmed.

ON REHEARING

PER CURIAM:

After full consideration of this case upon rehearing granted, a majority of the Court are of the opinion

that the original opinion and judgment of the Court should be adhered to.

It is therefore ordered that the original opinion and judgment of this Court, rendered on March 24, 1942, be and the same are hereby adhered to and that the mandate of the Court go down in accordance therewith.

WHITFIELD, TERRELL, CHAPMAN, and THOMAS, JJ., concur.

BROWN, C. J., and BUFORD, J., and Circuit Judge Welch, dissenting.

### ON REHEARING

Welch, Circuit Judge, dissenting:

This appeal brings on for review the final decree in a divorce case from the Circuit Court of Martin County, wherein Toley Engebretsen, husband and plaintiff, in the court below, was awarded a decree of divorce from Bessie Mae Engebretsen, wife and defendant below, and the custody of their two minor children, with the privilege granted to the mother of visiting the said children. For convenience, the parties will be referred to here as they appeared in the Court below.

The husband charged his wife with adultery and with extreme cruelty, which was denied by the wife in her answer. The wife, by way of cross complaint, or counterclaim, charged her husband with extreme cruelty; and each sought a decree of divorce from their bonds of matrimony.

There is nothing new or novel in the situation presented here and if this was an opinion on original hearing, the writer would be content merely to say, 'that we have examined the record, the briefs of counsel, and heard oral argument at the bar of this

Court, and finding no reversible error, the decree of the circuit court is hereby affirmed.' But in as much as different conclusions have been reached from those set forth in the original opinion, filed March 24, 1942, and a different opinion and judgment is here now to be given and entered on this re-hearing, the writer deems it proper to set forth the essential facts as shown by the record and upon which this opinion and judgment is based.

The parties to this cause were married to each other in Jacksonville, Florida, on or about August 17, 1927, and immediately thereafter began their life together at a place in Martin County a few miles from a small fishing village located in said County, known as Salerno, Florida. The plaintiff husband had been married before. His former wife was dead, but he had a small son, about four years of age, as a result of his prior marriage. The plaintiff, together with his wife and small son, lived out in the country from Salerno for a time and from all that appears from the record it seems that the family life for the first few years was comparable to that of the average American family of modest means. At the time of their marriage, and for some time afterwards, the plaintiff was employed by the Arundel Corporation, as captain of a tug boat, and was stationed at Salerno. Under these circumstances things moved along uneventfully, the husband going to and from his work at Salerno and the wife performing the usual and ordinary household duties. Sometime afterward the husband resigned his position with the Arundel Corporation and opened up a business of his own at Salerno. The business is known as Toley's Boat Yard, at which small boats are repaired and a number of

fishing boats are operated for hire, for the purpose of taking out fishing parties, and a small store, the stock in which consists of hardware and supplies for small boats, which stock is sold to the public as well as used by the plaintiff in his business of repairing boats. The husband proved himself to be a hardworking and thrifty man, the business was a success and he accumulated considerable money and property.

Not all of his wealth, however, was accumulated after his second marriage, as the record shows that he paid income tax on $14,000.00 the year prior to his marriage to the defendant in this case. After the business was established in Salerno the family moved from the place out in the country to Salerno, living in an apartment up over the store. The record shows further that defendant and her people were poor people, and that in addition to taking care of his own family, the plaintiff supported one or more members of his wife's family for a good portion of the time that he and the defendant lived together and permitted the wife to send money to her family in Jacksonville every two weeks and to make gifts of clothing to them; the record further shows that deposits of money were made in the post office from time to time in the name of the wife and at the institution of this litigation there was approximately $2500.00 on deposit in the post office in the name of the wife.

As time went on the wife began to grow careless and indifferent to her household duties, the record indicating that her step-son, Edward Engebretsen, was required to do practically all of the house work, (with the exception of caring for defendant's bed room), sweeping, cleaning the house, washing the

dishes, etc., and was also required to look after the two small children, who are half-sister and half-brother, even to changing their diapers; because, as he testified, 'if I didn't do it, she wouldn't'; while the defendant spent more and more of her time away from the home. She also required the step-son to stay in his own bed room when he was not busy with his household chores, and instructed him not to talk to his father, telling him on one occasion, according to his testimony, 'that if I didn't stop talking to him that I wasn't going to wake up.'

The wife undertakes to explain her absence from and neglect of the home by claiming that she worked in plaintiff's store and thereby helped him to accumulate his property; but in view of the fact that the record discloses that the average, gross, monthly sales from this store was about $20.00 per month, we can hardly see why so much of her time was required and especially when it is shown that she had a home and two small children of her own who needed her care and attention much more than this small store did; nevertheless, in this state of affairs things drifted along, the husband's business was expanding, the children were growing older, and apparently, the father was demanding more of the boy, Edward's time in the business than the step-mother was willing, for him to have.

About the year 1937 it appears that the wife begun to seek new interests, began to spend a good many of her evenings away from home without taking the trouble to explain to her husband that she was going to be away, or where she was going, or if she told him, she very often didn't tell him the truth about it; sometimes telling him that she was going to be over

at a neighbor's house, when in fact she would be out "jooking." On one occasion going on a beach party with a man named Strickland and whose nick-name was "Strick," together with another man and a woman named Tatum, whose reputation is admittedly bad, and on this occasion the defendant was seen out on the beach with this man, "Strick," the man sitting on a log and she sitting in his lap with her arm around his neck; and another time, while returning from a beach party about two o'clock in the morning, with this same Mrs. Tatum and two men, the defendant and her companion, a man named Jones, was observed in the back seat of the car, with their arms locked around each other. On still another occasion, she and this same Mrs. Tatum went to a neighbor's house, a Mrs. Carsons', about seven o'clock in the morning and told her that she, the defendant, had been "jooking" all night and hadn't been to bed all night; she also told Mrs. Carson that all her husband cared about was money and that she didn't care anything about him. She said all she was in for now was a good time.

The escapades of the defendant mentioned here are only a few of the many such similar escapades indulged in by her, according to the record, during the years 1937, 1938 and 1939. It is contended by counsel for the defendant, the appellant here, that proof of such conduct on the part of the defendant is not proof of adultery. This we readily concede; but, we do think that continued indulgence by the defendant in this kind of conduct tends to show "desire" on her part. The record shows that the defendant's reputation for chastity in the small community in which she lived had become "bad," before the institution of

these proceedings. There is the testimony of eight or ten witnesses, among whom are her neighbors and kins people, to this effect in the record.

This brings us now to the specific charge of adultery as alleged in the bill of complaint and the proofs adduced to sustain the charges. The eighth paragraph of plaintiff's bill, is as follows:

"VIII

"That the defendant has also violated her marital duties by acts of adultery, by the defendant with her brother-in-law, Audley Hiers, on the night of December 12th, 1939, during an automobile trip from Salerno, Florida, to Fort Pierce, Florida, and vicinity and return. That the defendant also committed acts of adultery with the said Audley Hiers on various nights from the 5th of December, 1939, to December 12th, 1939, inclusive, except Sunday, at places unknown to your plaintiff. That again at a beach party at Jensen Beach in Martin County, Florida, on the night of October 5th, 1931, at about 9:00 o'clock P. M., the defendant committed adultery with the said Audley Hiers."

The plaintiff, to sustain the charges of adultery against his wife, produced as a witness, one, W. H. Strickland, (no relation to the Strickland whose nickname is "Strick"), who had been a constable for four years and a deputy sheriff for eight years in Georgia, who testified, in substance, as follows: That he had seen the defendant and Audley Hiers together; that on the night of December 11, 1939, right after dark, he and a man by the name of Lee DeLoach, followed the defendant and Hiers and saw them go down what was known as "Dead-End" Street; that the defendant

and Hiers stopped their car and got out; that they went off about fifteen feet from the car and got down in the grass and bushes, out of sight, and stayed there on the ground about twenty minutes; that the witness had been coming to Salerno for the past three years; that he knew the defendant and Hiers; that he knew the defendant's reputation was bad; that he heard a lot of people talking about she and Hiers; that he followed them on this occasion, as he put it, 'to see if there was anything to it;' that he had seen the defendant and Audley Hiers together practically every night for about a week.

The next witness, Lee DeLoach, who owns a fish market in Salerno, and is a son-in-law of the witness, W. H. Strickland, testified, in substance, that he saw the defendant and Audley Hiers together every night, except one, between December 3rd, and December 12th; that he was with the witness, W. H. Strickland, when they followed the defendant and Audley Hiers down "Dead-End" Street; saw them get out of the car; that the grass around this spot was approximately 3 feet high; that the defendant and Hiers stayed out of sight 'fifteen minutes or better;' that the reputation of the defendant was not so good. The only denial of this testimony was the bare statement of the defendant and Audley Hiers that they did not go down that road and that they had never had improper relations; they neither one testified as to where they were on the night of December 11th, or offered any proof as to where they were on that particular night, although they admitted they were together many nights about that time.

The record in this case is voluminous, containing over 700 pages, but, in it is the testimony of many

witnesses to the effect that the defendant and Audley Hiers were seen together every night, except one, between December 3rd and December 12th; the record shows that on the night of December 12, 1939, the defendant left her home before her husband quit work; that she left Salerno in an automobile with Audley Hiers, taking the two younger children with her; that she left the little girl at the home of an acquaintance of hers; that she and Hiers and the little boy went to Stuart, Florida, where they put the little boy out to go to a picture show; that she and Hiers left Stuart in a car by themselves; that she did not return that night until about eleven-thirty; that she and Hiers were gone from Stuart approximately five hours; that they did not return to Stuart to pick up the little boy from the picture show until he had seen the picture once, had seen part of it again and the person in the ticket office had gone; on her return, and upon being asked by her husband where she had been, she claimed that she had been to Fort Pierce to visit her sister, but the record shows that she did not visit her sister on that night; after considerable argument and bickering between her and her husband, she finally admitted to him that she had been out alone with Audley Hiers; and shortly after the separation she told Mrs. George Gunderson that she had admitted to her husband that she was out alone with Audley Hiers on this particular night, although she was then trying to get Mrs. Gunderson to come into court and testify that she, Mrs. Gunderson, went to Fort Pierce with her and Hiers on that occasion. The record also contains evidence to the effect that Audley Hiers tried to force his, (Hiers') wife, who is a sister of Mrs. Engebretsen, to go to court and

testify that she, Mrs. Hiers, was with Hiers and Mrs. Engebretsen on the night of December 12th and that they went to Fort Pierce. Upon her refusal Hiers beat his wife, giving her a black eye and otherwise injuring her. That when Hiers found out that his wife was going to be a witness in this case for the plaintiff he informed her, 'that if she testified for the plaintiff she would wish she hadn't.'

Mrs. Hiers testified, in substance, that her sister, Mrs. Engebretsen, had taken her, (Mrs. Hiers'), husband away from her and that she had been to her sister and begged her to stop going with him. That Hiers had told her, (his wife), that he was in love with Mrs. Engebretsen; that he would kiss and "make over" a photograph of Mrs. Engebretsen that he had in his possession. The record shows that other of Mrs. Engebretsen's relatives had been to her and remonstrated with her about her conduct and associates, but to no avail; in fact, there is testimony in the record of numerous witnesses and covering hundreds of pages, that would tend to show both desire and opportunity on the part of the defendant to commit the act charged, but we can see no good purpose in setting out any more of this sordid record than is here set forth. We think the testimony of the witnesses, Strickland and DeLoach, coupled with other proven circumstances in the case is sufficient proof of adultery.

Counsel for appellant has devoted considerable portions of his written briefs and oral argument at the bar of this Court to apparent conflicts in the testimony, but, in view of the fact that the testimony in this case was taken before the chancellor in person and that he had an opportunity to see and observe

the witnesses on the stand, that as trier of the facts, it was his duty to reconcile such conflicts as properly could be reconciled, and to discard such testimony as was unworthy of belief, we think his findings of fact should have the same weight as the verdict of a jury; and having examined the entire record in this cause we are of the opinion that his findings of fact have ample evidence in the record to substantiate them. He found, among other things, that the defendant was guilty of adultery, and we see no reason to reverse his findings. Under the Statute law of this State an adulterous wife is not entitled to alimony, (Section 3195 Rev. Gen. Statutes, 1920; Section 4987 Comp. Gen. Laws of 1927).

Defendant's (appellant here), counsel has argued strenuously at the bar of this Court and in his briefs, that the defendant was entitled to compensation for services she rendered the plaintiff during the years she lived with him as his wife. As stated above, it is shown by the record that the husband, plaintiff below, supported one or more of her family during a good portion of the time they lived together; that he permitted his wife to send money and make gifts of clothing to her family and that there was a deposit in the post office in the name of the wife amounting to approximately $2500.00, on which the chancellor awarded to the wife in the final decree appealed from. We think that she has been amply compensated for the services rendered.

Our view is that the disposition of this cause depends entirely on the force, effect and sufficiency of the evidence, that the decree appealed from finds ample substantial support in the record and therefore should not be disturbed by the appellate court.

BROWN, C. J., concurs specially.

BUFORD, J., concurs.

BROWN, C. J., dissenting and concurring especially in the opinion of Judge Welch:

It is well settled in this State that where the evidence is conflicting and there is substantial evidence to support the chancellor's findings, such findings will not be set aside unless the chancellor's conclusions from the evidence are clearly erroneous. This rule is especially applicable, where, as in this case,. the testimony was all taken before the chancellor in person. This Court has always been reluctant to disturb the decree of a chancellor upon the facts, especially where the evidence is conflicting and much depends upon the credibility of the witnesses. We have even gone so far as to hold in several cases that the findings of a chancellor on questions of fact, when the testimony is taken before him, are entitled to the same weight as the verdict of a jury, and if there is competent evidence, which if believed, will support his findings, they will not be disturbed unless clearly erroneous. See Bosheir v. Moeller, 83 Fla. 10, 91 So. 181, and Cobb v. Cobb, 82 Fla. 287, 89 So. 869 and the cases therein cited.

Applying these principles to the record in this case, which I have read very carefully, since the rehearing was granted, I do not believe that we should disturb the decree of the chancellor except in two particulars. In view of all the testimony, I think it is quite plain that the appellant and appellee lived together as husband and wife quite happily for a period of some nine or ten years, during which time the wife in many ways was helpful to the husband in his business and

made it possible for him to give practically all of his time to the maintenance and building up of his business, which he evidently did with a considerable degree of energy and business ability. Indeed, the record indicates to my mind that the appellee husband was to some extent responsible for the tragic circumstances which brought about their separation. There is strong indication in the evidence that as the years went by he became more and more absorbed in his business and more and more careless and indifferent to his wife and his home. Unfortunately, this happens all too often, especially, it seems, in the case of energetic and ambitious men. However, the evidence does indicate that this husband was fairly liberal with his wife in money matters and allowed her to render considerable financial and educational assistance to members of her own family. In the early days, the wife had to work quite hard, doing all of her house work, looking after the children, milking the cows, etc., until they moved into Salerno, after which time she did not have such heavy household duties, but did put in a large part of her time looking after her husband's small marine supply store and otherwise assisting him in his business. And several of the complainant's witnesses, who testified that the character of the appellant had become bad for chastity, also testified that they liked her very much, and one of them, old Mrs. Gunderson, testified that in spite of all that had been said, the elderly Engebretsen would be welcome in her home at any time. In view of these circumstances, I think that the chancellor should have made a somewhat more liberal allowance or property settlement in behalf of the wife than was made, and also that the custody of

the children should have been more equally divided between the husband and the wife, as the best interest of the children would permit, as provided for in the original opinion of the court.

I am also inclined to the view that the charge of cruelty made in the wife's cross-bill was substantially proven, especially at the time of and shortly subsequent to the separation, not only by the testimony adduced in her behalf but also by some of the testimony adduced by the complainant in the court below.

With these modifications, I concur in the dissenting opinion written by Judge Welch, sitting in the place of Mr. Justice ADAMS, who was disqualified. At best, this is a sad case, and one which has given this court considerable concern, as it must have given the chancellor below. However, for the reasons above stated, I think the decree of the chancellor should be affirmed with the modifications above suggested.

But a majority of the Court have just as honestly and sincerely reached the conclusion that our original opinion and judgment should be adhered to, and this conclusion becomes, of course, the judgment of the Court.