Action for divorce by Harold D. Harmon against Mary Prime Harmon, who filed a counterclaim for alimony and other relief. From the judgment, defendant appeals.
Affirmed in part. Reversed in part.
The issues in this case were tried upon the complaint of the husband, appellee here, the answer and counterclaim of the wife, appellant here, and the replication of the complainant.
In the initial pleading it was charged that the wife's faultfinding, constant criticism of the husband's actions, repeated outbursts of temper, and successive threats to kill the husband constituted the formal grounds of habitual indulgence in a violent and ungovernable temper and extreme cruelty. The relief sought was a divorce, the care and custody of a five-year-old adopted daughter, injunction against the sale by the wife of bonds alleged to be the property of the husband, an accounting for one-half of the bonds or their value, a partition of certain real estate, and the return of personal property which it is not necessary to detail.
In the answer there was a denial of the salient features of the bill of complaint, and in the counterclaim a charge by the defendant wife of cruelty on the part of the husband, followed by a prayer for custody of the child, retention of possession of the real estate occupied as a home, execution by the husband of a deed to the wife for his part of it, allotment of alimony, support money, and reasonable attorneys' fees, and the grant of relief under Section 65.09, Florida Statutes, 1941, and F.S.A., providing for alimony to a wife living apart from her husband if cause for divorce exists in her favor.
At the conclusion of the testimony, which was more than six hundred pages in length when transcribed, the master made a very comprehensive report, discussing all phases of the litigation. He found that the original plaintiff was not in fact a bona fide resident of the state at the time he instituted his suit, had not suffered physically or mentally from the *Page 211 
alleged conduct on the part of his wife, but, on the other hand, had himself been guilty of cruelty toward her. He recommended that the defendant wife be awarded the custody of the child and $250 monthly for maintenance and support of herself and the child. In addition he recommended that the husband make the monthly payments on the house occupied by them in an estate by the entirety, and that if the property should eventually be sold, the proceeds should be divided equally between them. He concluded also that the bonds in question should be divided between the parties and that the husband should be required to convey to his wife his interest in a Chrysler automobile, then in possession of the defendant, and the husband should also pay stipulated sums for the maintenance of the car, medical expenses, and so on, and should discharge all costs incurred in this litigation.
When the exceptions to the master's report reached the chancellor, all of them were overruled except those directed to the findings anent the plaintiff's residence, the husband's misconduct, and the wife's blamelessness for the disruption of the marriage.
Thus, concisely stated, we are confronted with the question of the propriety of the chancellor's action in overruling the master on the matters of the residence of the original plaintiff, the guilt of the husband and the innocence of the wife.
We are not inclined to disturb the ruling of the chancellor so far as the residence of the plaintiff is concerned, although there is considerable testimony that when he left the home owned and occupied by both he made the statement that he did not intend to return. He was an airline pilot, a profession which from its very nature would likely require him to be a transient as he pursued his duties. He operated planes on various "runs" between different cities of the United States, and at one time piloted them to South America. About the time of the final separation of the parties he was transferred from Miami to Atlanta to become a "check pilot," an undertaking in line with his occupation, and probably a promotion. It would have been impractical for him to move his family each time he was required by his company to assume some new duty, and we think the chancellor was well within his authority when he decided that, although the husband had gone to Atlanta in his new work, the prerequisites to an actual change of residence were not conclusively established. His own explanation of his remark to some friends about moving and having no idea of returning was that he was referring to the final separation from his wife and that he had no intention of fixing his residence in Atlanta, whither he had gone upon instructions of his employer. In this connection the chancellor probably had in mind the decision of this court in Ogden v. Ogden, 159 Fla. 604, 33 So.2d 870, 873, wherein Mr. Justice Terrell, writing for this court, said that "the best proof of one's domicile is where he says it is."
Weighing all the testimony in this case, we cannot say that the chancellor clearly erred when he held that the factum and animus necessary to change of residence were not proved. Mills v. Mills,153 Fla. 746, 15 So.2d 763.
After a perusal of all the testimony we are, however, convinced that the question of who was wrongdoer was properly decided by the master in the first instance. To establish the charge that the wife had been guilty of extreme cruelty the husband introduced testimony to show that her attitude and actions had been so merciless that they amounted to such treatment because of their effect upon his mental and physical state. We have held in many cases, and as late as Masilotti v. Masilotti, 150 Fla. 86, 7 So.2d 132, 134, that for such conduct to constitute extreme cruelty, in the absence of actual physical violence, it must have been of such nature that it damaged health, made cohabitation intolerable and unsafe or in the case of threats that they created an abiding apprehension of bodily violence "so as to render it impracticable to discharge marital duties." As for his charge in the instant case that she was guilty of an ungovernable temper, it should be pointed out that the rule, stated in the same case, is that for one to prevail on that ground he must *Page 212 
show that the outbursts of temper were habitual and injuriously affected the health and safety of the victim and rendered life an oppressive and intolerable burden. We think that the testimony of the plaintiff did not meet either of these tests.
As we have said, the plaintiff husband, who claims that he was so cruelly treated, is engaged in an occupation requiring a strong physique and a steady nerve. This is emphasized by the unquestioned testimony that in order to continue as a pilot he is subjected to three physical examinations in the course of each year — one by the physician of his employer and two by a physician of the Civil Aeronautics Authority. Despite the gross misconduct charged to his wife, he has never failed to pass one of these examinations, which he himself says include a check of his "nervous system and reactions." Certainly his health could not have been appreciably damaged if he has been able to pass the rigid examinations which he has undergone.
The charges of cruelty and ungovernable temper really are epitomized in the term "nagging," and doubtless there was considerable argument, dispute, and bickering as they intermittently lived together. The overtone of all this, however, seems to have been the wife's objections to the extravagances indulged in by the husband. He spent sizable amounts of money on sports to which he was from time to time attracted. He bought an expensive motor boat, paid large amounts for guns, fishing tackle, and the like, which she thought far in excess of his needs and beyond his means. She was consistent in her attitude, for she was willing to do her housework without the help of a maid except on infrequent occasions, and obviously her motive was to conserve their funds against the time when his earnings would be diminished. Presumably an airplane pilot can maintain his income in that capacity for only a limited number of years before the ravages of time may so affect his physique and his "nervous reactions" that he cannot longer perform his strenuous task with safety to his passengers.
The record is replete with evidence that the master paid close attention to the stories that were unfolded by the witnesses of the parties, and frequently he injected questions of his own to develop some pertinent point. In his painstaking report he recorded his impressions and conclusions based on the testimony he had heard.
From our own careful study of the facts reflected in the transcript and the opinions of the master we are constrained to the view that he was sound in his judgment that the so-called "nagging" charged to the wife was not proved to amount to an ungovernable temper or extreme cruelty. On the contrary, there is abundant testimony to establish that the husband was guilty of philandering to such an extent that the sensibilities of his wife were not only jarred but shocked to the point that she actually suffered in mind as well as in body from his inattentions to her and his attentions to others of her sex. There is no need to dwell upon the instances of his misbehavior as they were related by the witnesses; so we shall close this chapter merely by observing that his misconduct constituted a ground for divorce entitling her to relief under the statute, 65.09, supra.
In approving the conclusion of the master on this point we have not disregarded the numerous decisions of this court that every presumption favors the correctness of the rulings of the chancellor; that a final decree, based largely or solely on questions of fact, will not be reversed unless the evidence clearly shows it to have been erroneous, Hamilton v. Laesch,134 Fla. 591, 184 So. 110, a rule which was said in Guerra v. Guiterrez, 66 Fla. 570, 64 So. 232, to be especially applicable where the trial judge had heard the testimony. It would seem from this pronouncement that the presumption is one of degree, being stronger when the chancellor has himself heard the witnesses testify. This emphasis is particularly important in this case, where all the testimony was actually heard by the master selected by the chancellor, and none of it was heard by the latter. It is patent that the principal reason for the stronger presumption is that an appellate court gains its view of the controversy from *Page 213 
the cold type of a record and has no first hand information therefore of the attitude or the demeanor of the witnesses and no way to interpret accurately the word of a witness where the meaning may be materially changed by the inflection of a voice or by the location of an accent. Of course where, as here, the chancellor has heard none of the witnesses, he has been placed at the same disadvantage.
We have borne in mind too the decision of this court in Burns v. Burns, 153 Fla. 73, 13 So.2d 599, where Mr. Justice Brown, writing for the court, stated that the report of a special master was only advisory to the chancellor who was not obligated to follow the conclusions of law or of fact reached by the master.
Parenthetically, this court has allied itself with those courts which place added importance on the reports of masters to whom matters are submitted by agreement of the parties. McAdow v. Smith, 127 Fla. 29, 172 So. 448; Kent v. Knowles, 101 Fla. 1375,133 So. 315; Simpkins, A Federal Equity Suit, page 600 et seq.; 33 A.L.R. 765. In such situations it has been said by this court that the findings have the weight of the verdict of a jury. Croom v. Ocala Plumbing Electric Company, 62 Fla. 460, 57 So. 243.
While it cannot be questioned that in a case where the chancellor has appointed a master and empowered him to make findings he may override or modify them in any manner consistent with the justice of the case, he may not do this except for good cause. We interpret "good cause" to mean a showing that the findings of fact by the master were clearly erroneous.
From our study of the subject it seems to us logical, if the master has heard all the testimony, that an exceptant to his findings undertakes the burden of showing that the master has clearly made a mistake — in other words, the same burden as an appellant who challenges in this court the conclusions of fact reached by a chancellor who has heard the witnesses. After all, the master acts as an agent of the chancellor, and what he does in the capacity is in effect done by the court. These recommendations should be set aside only upon good cause, even though the findings were, as we held in Burns v. Burns, supra, advisory. Federal Equity Practice, Street, Vol. 2, page 910.
In fine, we have the view that where, as in this case, a competent master is selected by the chancellor and attentively conducts the hearings, thoroughly digests the testimony of the witnesses, and arrives at conclusions which are logical and well supported, his findings, although advisory, should not be set aside arbitrarily or capriciously (of which there is no claim in this case) nor should they be disregarded or overruled by the chancellor simply because of an opinion of the chancellor at variance with that of the master. As we have said, the master was acting as an accredited agent of the chancellor and was at the time performing a service which would have been performed by the chancellor himself but for the appointment. Having seen and heard the witnesses, he had a definite advantage over the chancellor, who reviewed the case from a typewritten record.
We reach the conclusion that those who excepted successfully to the master's report on the point now involved did not clearly show error on the part of the master and that in all the circumstances there was no occasion to upset those findings of fact made by one so well positioned to measure them.
It is our view that the presumption of the correctness of the chancellor's ruling in overriding his master is overcome, for in this case he was in no better vantage point to judge the weight of the testimony on material questions of fact than is a member of this court, and we are convinced that the master placed the proper interpretation on the testimony. It seems to us that when we arrive at an opinion that the conclusions of a master who heard the testimony are abundantly supported by that testimony, the presumption that the chancellor was correct vanishes, and we may direct that a decree on the relative conduct, or misconduct, of *Page 214 
the parties be entered in consonance with the master's findings. This we do.
Affirmed in part. Reversed in part.
ADAMS, C.J., TERRELL, J., and WHITE, Associate Justice, concur.