119 So.2d 88 (1960)
William H. GRAHAM, Petitioner,
v.
FLORIDA REAL ESTATE COMMISSION and Jack King, Respondents.
No. 1554.
District Court of Appeal of Florida. Second District.
March 25, 1960.
*89 Icard, Merrill & Cullis and Curtis J. Timm, Sarasota, for petitioner.
Benjamin T. Shuman and Edward L. Bridges, Winter Park, for respondents.
BARNS, PAUL D., Associate Judge.
The Florida Real Estate Commission instituted proceedings against petitioner, Graham, seeking the suspension or revocation of petitioner's license as a real estate broker pursuant to Chapter 475 F.S.A. After a citation and hearing petitioner was found guilty of "fraud, concealment and breach of trust in a business transaction" in violation of Chapter 475 F.S.A. Thereupon petitioner sought review here by certiorari. We find error, grant the writ of certiorari and quash the order of suspension.
Section 475.25 F.S.A., (1957) authorizes the commission to suspend the license of registered broker "upon a finding of facts showing that the registrant has:
"(a) Been guilty of fraud, misrepresentation, concealment, false promises, false pretenses, dishonest dealing, trick, scheme or device, culpable negligence, or breach of trust in any business transaction * * *."

Findings of Facts
Petitioner Graham is a registered real estate broker residing in Venice, Florida. During February of 1957, Father George W. Cummings, a Catholic priest in Venice, contacted petitioner concerning the possibility of petitioner purchasing or finding a purchaser for the balance of a certain parcel of land on Manasota Key in which he was personally interested. The legal title to the property in question was held by the Union Trust Company of St. Petersburg, Florida, as trustee for a syndicate of St. Petersburg businessmen represented by a Mr. Robert Workman. The property was a 952 foot strip running north and south on Manasota Key from the Gulf of Mexico to Lemon Bay in width.
Father Cummings desired to purchase the south 100 feet of the 952 foot parcel for cash, but understood that the sellers would not break up the tract but desired to sell the entire parcel at one time. It was suggested by his uncle, Ray Cummings, a real *90 estate salesman employed by Smith Brothers Realty Company, St. Petersburg, that if he could find a purchaser for the balance of the property, he could obtain the south 100 feet as part of the purchase. Smith Brothers Realty Company at this time had a nonexclusive listing on this property.
Thereafter, Father Cummings contacted petitioner Graham about finding a purchaser for the balance of the property and advised him to contact his uncle concerning details. Petitioner thereafter contacted Ray Cummings concerning price and terms. Petitioner then contacted Mr. James Rountree, a registered real estate broker who had a one-room office in Sarasota, Florida. Petitioner had previously been employed by Rountree as a real estate salesman and the two of them had previously purchased investment property together, with petitioner furnishing all the money and Rountree selling the property for a one-half interest in the profits.
When Graham was discussing with Rountree the possibility of purchasing this property, a Mr. J.W. Chitwood of Sarasota was in his office and overheard the conversation. Mr. Chitwood was a client of Rountree's office and specifically the customer of Irene Petersen, a real estate saleswoman employed by Rountree at that time. Chitwood advised Mrs. Petersen, Rountree and petitioner that he represented a South Carolina doctor who was interested in purchasing some Gulf property. These conversations occurred in Rountree's office several days prior to March 16, 1957.
On or about Thursday, March 14, 1957, Chitwood, Rountree and petitioner drove to Manasota Key and walked over and examined the property. By this time, petitioner had obtained a plat of the 952 foot parcel involved. Copies of this plat were furnished to Rountree and Chitwood.
Petitioner states that he advised Rountree and Chitwood that one of the conditions of their purchasing the property was that the south 100 feet would have to be sold to George Cummings (Father Cummings). Rountree denies this and claims that he did not know anything about the 100 feet until sometime on or about March 27, 1957, although subsequent events discount this testimony.
The purchase price of the 952 foot tract was $122,000, or $128 per foot. By Saturday, March 16, 1957, petitioner, Chitwood, for himself and Dr. Zigler (the South Carolina doctor), Rountree and Mrs. Petersen agreed to form "a partnership sort of thing" and to jointly purchase the property. Petitioner had $25,000 cash to invest and Chitwood had a fund of $20,000 of the doctor's money in a special account to invest, but Rountree and Petersen apparently had only sufficient cash to pay their share of the earnest money; however, petitioner had agreed and was willing to loan Rountree sufficient money to pay his share of the cash required on closing so that Rountree could participate in what the purchasers thought would be an excellent purchase.
The parties, on Saturday morning, March 16, 1957, met in Rountree's office. At this time, Rountree typed on his typewriter an offer to purchase on a standard printed realtor's "Receipt and Offer to Purchase" form. Chitwood and Rountree were listed on the contract as purchaser and at Rountree's suggestion, petitioner was listed as broker. Neither Dr. Zigler nor Mrs. Petersen's name appeared on the contract.
The first sentence of the legal description typed by Rountree on this contract (hereinafter referred to as the first contract), had as the southerly starting point a line 100 feet north of the southerly boundary of the property. Since the legal description started 100 feet north of the section line (which was the south boundary of the 952 foot tract), the first sentence described a tract from Gulf to Bay but only 852 feet long. There is an additional sentence of the legal description in this first contract which reads:
"Free and Clear Deed For Land Running Gulf to Bay on Section Line *91 15 North 100 feet to First Mentioned Line to George W. Cummings."
This second sentence describes the southerly 100 feet of the 952 foot tract. Both sentences together describe the 952 foot tract of property. Rountree insists that this second sentence was added by petitioner Graham, after Graham left Rountree's office with the contracts, without his knowledge and consent and with the intent to cut out this 100 feet for himself and to defraud and deceive the others. All parties agree that the second sentence of the legal description was apparently typed on Rountree's office typewriter.
Graham left Rountree's office apparently between 11:00 A.M. and 12:00 noon, picked up his wife who was shopping in downtown Sarasota, and personally delivered the contracts and check to Smith Brothers Realty Company in St. Petersburg between 12:00 noon and 1:00 P.M. that same Saturday. This occasion was the first time petitioner met Ray Cummings.
At the time Graham left Rountree's office, Chitwood, Rountree and Mrs. Petersen were still in the room where the typewriter was situated and they remained there until about noon. Graham did not have a key to Rountree's office and there is no evidence of any forcible entry of Rountree's office.
On Monday, March 18, 1957, Smith Brothers Realty Company presented the contracts to Robert Workman, who acted as spokesman for the sellers. The sellers, after examining the contract, rejected the same because they felt the legal description was inadequate and they wanted to provide that a first mortgage against the property in the amount of $10,000 would be assumed. The sellers then prepared a new contract dated March 20, 1957 (referred to as the second contract). The contract terms, as far as purchase price and payment, were virtually identical with the exception of the assumption of the mortgage and an abatement of deferred payments to be made to the sellers. The legal description was somewhat different. It described the entire 952 foot tract and then provided that: "The South 100 Gulf front feet of the tract described as above to be deeded free and clear to George W. Cummings."
Prior to the preparation of the second contract, Ray Cummings had taken his nephew, Father Cummings, to meet Mr. Workman in St. Petersburg. At this and prior discussions, Workman was advised and understood that Father Cummings would pay $12,800 in cash directly to the sellers for the south 100 feet of the property at the closing of the transaction on the second contract. He was then to get a deed from the sellers to the south 100 feet free and clear of any mortgage or mortgages. The per foot price to be paid by Father Cummings for the property was $128 per foot, or the same price being paid by the other purchasers for the property. At the time of the second contract, a Miami Syndicate was also very interested in purchasing the property for a higher price but with less cash, which fact was communicated to petitioner and the other purchasers.
The second contract was then mailed to Petitioner. Upon receipt of the second contract, petitioner states that he called Rountree at Rountree's office from Venice, concerning immediately getting the signatures of Rountree and Chitwood on the contract and returning the same to sellers for execution. Petitioner states that during this telephone conversation he advised Rountree that he was adding his name as a purchaser to the contract, that the legal description had been changed and of the matter of assuming the first mortgage. At and prior to this time, all negotiations concerning the property on behalf of the purchasers had been conducted by petitioner.
Petitioner further states that he wanted to arrange for Rountree and Chitwood to sign the contract, but Rountree told him that he had to go out to the airport immediately to meet a prospect and that Chitwood *92 had gone to South Carolina and would not be back for a couple of days. Petitioner further states that Rountree then told him to go ahead and sign his and Chitwood's names to the contract and return the same to the sellers immediately, since it was substantially the same as they had agreed upon. Graham then signed his name and the names of Rountree and Chitwood to the second contract and delivered the contract to Smith Brothers Realty Company.
Rountree denies that this telephone conversation ever took place and says that Graham had no authority from him to sign his or Chitwood's names to the second contract.
Mrs. Petersen testifies that she was present when Graham called Rountree and stated that "there was some change in just the way it was to be paid, the terms so to speak, it didn't change the selling price." She further stated in regard to this conversation that: "* * * We agreed that something that didn't change the price was immaterial, nothing was being changed that made any difference." Mrs. Petersen acknowledges that Graham had authority to make these changes. Chitwood states that he knew about the mortgage being assumed and that: "* * * and the first hundred feet we were immediately to receive free and clear on the signing of the contract and the payment, the down payment that we were to have a hundred feet of land that we could dispose of." He further states that he became aware of the fact that there had been some changes in the payment clause and that "Mr. Graham probably had authority to change the amount." Chitwood further states in his testimony that: "the only thing I find fault in what Mr. Graham did was sign my name to it."
Graham states that he acted in good faith on Rountree's advice and for the purchasers' best interest because the contracts were the same and it was necessary that the contracts be immediately executed; that he should have put an X by the names of Rountree and Chitwood, but that he made no attempt to forge the signatures. Chitwood acknowledges flying to South Carolina during the week of March 17-24, 1957. All parties understood that immediate action was required on the contract because of the negotiations with the Miami Syndicate.
Upon return of the second contract to sellers, they were executed by the trustee, Union Trust Company on March 22, 1957.
On or about March 24, 1957, Dr. Zigler came to Sarasota. Upon his arrival he viewed the property and that Sunday evening or on Monday evening, March 25, 1957, a meeting between all purchasers was held in Venice at petitioner Graham's residence. At this meeting, the proposed development and sale of the property were discussed. During these discussions, Dr. Zigler indicated that he was planning to buy the south 100 feet of the 952 foot tract for $12,000, which Graham said was impossible in view of the previous disposition of this 100 foot parcel.
The evidence would indicate, although Dr. Zigler did not testify before the Commissioner's Examiner, that he did not learn of the south 100 feet being promised until he arrived in Sarasota.
After considerable discussion, the sellers agreed to return the $10,000 earnest money. This sum was later returned to Rountree who then returned to the various purchasers all but Graham's money, which he retained.
When Rountree refused to return his share of the earnest money, Graham commenced a chancery action in the Circuit Court for Sarasota County to secure the return of this money. The circuit judge found all issues in favor of petitioner, imposed a constructive trust on the funds appropriated by Rountree, and ordered a return of said sums to Graham.
Thereafter, on the complaint of Rountree, the Florida Real Estate Commission filed an Information against Mr. Graham, charging him with fraud, concealment and *93 breach of trust, and on July 29, 1959, based on findings of fact materially different from the above facts the Florida Real Estate Commission found petitioner guilty of fraud, concealment and breach of trust, and suspended his registration for one year.

Conclusion
The testimony was not taken before the Commission but by an examiner who was not authorized to and did not make findings of fact; the findings of fact by the Commission were based on the transcript of the testimony supplied by the examiner. Hence the rule that findings of fact, made by one who had the opportunity to judge the credibility of the witnesses upon their oral examination may not be set aside unless "clearly erroneous" does not have full application here. This court is in just as an advantageous position to make its findings as was the Commission. See Harmon v. Harmon, Fla. 1949, 40 So.2d 209. Furthermore the facts of this case are not in dispute to any great degree.
From the foregoing facts it does not appear that the petitioner defrauded or attempted to defraud anyone. The south 100 feet of the tract was to be conveyed free and clear to George W. Cummings, i.e., free and clear of the mortgage but the petitioner and his joint adventurers were to get the benefit of the purchase price to be paid by Cummings. Rountree authorized a modification of the contract by Graham and did not repudiate it upon learning of Graham signing his name to it. Chitwood was satisfied with the terms but complained of Graham signing his name after Dr. Zigler, his client was told he could not obtain the 100 feet that Father Cummings was to purchase. There was no conspiracy between Graham, Ray Cummings and George W. Cummings whereby either George Cummings or Graham was to get the 100 feet at the expense of others. It was understood by all who knew anything about the true facts that Father Cummings was to pay for what he was to receive at the same front footage value as were the others, and that the others were to receive a credit on their purchase price for the amount of his payment. There are no facts sufficient to support the finding that the petitioner has been guilty of a breach of trust.
Writ of certiorari is granted and the order of suspension dated July 29, 1959, is quashed.
ALLEN, C.J., and STEPHENSON, GUNTER, Associate Judge, concur.