ALLEN, Acting Chief Judge.
The appellant-husband was the plaintiff and counter-defendant in the court below. The appellee-wife was the defendant and counter-claimant. This is an appeal from an order whereby the chancellor, in rejecting the recommendations of the Special Master, dismissed with prejudice both the husband’s complaint and the wife’s counterclaim. The wife has cross-appealed. We shall reverse the chancellor and remand the case for the purpose of having a decree entered granting the appellant a divorce.
The plaintiff filed his complaint in the lower court seeking a divorce from the defendant on the ground of adultery. It was charged that the defendant-wife had committed adultery in a motel with one John Miller on two successive nights in February of 1963. The only relief prayed for by the husband was that the court grant an absolute divorce.
The defendant-wife’s answer denied the material allegations pertaining to the adultery charge, and by counterclaim the defendant sought a divorce from the plaintiff on the grounds of extreme cruelty and habitual intemperance.
The plaintiff-husband filed in reply to the counterclaim a general denial of the alleged extreme cruelty and habitual intemperance.
Upon applications' to the court by both parties, an order of reference was entered, pursuant to which a Special Master was appointed to take the testimony and to report the same, together with his findings of fact and conclusions of law.
The Special Master, in a very comprehensive report, stated:
“The plaintiff is General Superintendent for the Gahagan Dredging Company, with a salary of $15,000, which salary is supplemented by bonuses and necessary travel expenses. The dredging company had projects under way in New York, Puerto Rico, Jamaica, and Cape Canaveral, which requires the supervision of the plaintiff and necessitated his absence from home much of the time. However, the record shows that he came home on weekends and at other times.
“The defendant is asking for a divorce on the ground of habitual intemperance and extreme cruelty alleging the use of profanity by the plaintiff toward the defendant and accusing the plaintiff of constantly fussing and nagging at her. She also charges that the plaintiff falsely accused her of other men and required her to account for every minute and move during their marriage.
“While the evidence shows that the plaintiff did drink intoxicating liquors from time to time, the evidence does not show that the petitioner was habitually drunk or so intoxicated by the excessive use of intoxicating liquors as would constitute habitual intemperance. The plaintiff frankly admitted taking drinks and on at least one occasion it is indicated that he had quite a few drinks. However, there is no evidence that he lost control of his faculties and that drinking to excess was habitual.
“As to the alleged acts of cruelty, while there is some testimony as to arguments between the parties and accusations, they relate primarily to domestic difficulties which were provoked by the defendant’s conduct.
“I, therefore, find that defendant has failed to sustain the charge of extreme cruelty and habitual intemperance, and recommend that the Counterclaim be dismissed.
[With respect to plaintiff’s cause] “The principles stated in McMillan v. McMillan [120 Fla. 209], 162 So. 524, Engerbretsen [Engebretsen] v. Engerbretsen [Engebretsen] [151 Fla. 372], 11 So.2nd 322, Heath v. Heath [103 Fla. 1071], 138 So. 796 [82 A.L.R. 537], are considered applicable. First, adultery is seldom established by direct tes *633 timony. The secrecy of the act ordinarily makes it impossible to prove except by circumstantial evidence. If the desire and the opportunity are shown, adultery will be presumed. Secondly, it is necessary to exercise great care in considering facts and circumstances, give them their plain and natural significance, considering them separately and as a whole and a conscientious conclusion reached similar to other litigated cases.
“The facts and circumstances disclosed by evidence in this case is that John Miller, an insurance agent, moved, with his wife and two children, to Tampa early in January, 1963, rented a furnished apartment at 4728 South Trask Street, Tampa, Florida, where they resided. On January 20 the plaintiff and defendant went to' the Rocky Point Golf Club and played golf with Miller. So far as the record disclosed, this is the first meeting between the defendant and Miller, who indicated an interest in having his wife invited to join a club of which Mrs. Petersen was a member.
“On January 29, the plaintiff went to Fort Myers on business and called the defendant long distance, but was unable to get an answer to his call. On February 1, the plaintiff returned to his home from Cape Canaveral in the evening and found bottles, glasses and an Hawaiian lei on a chair. After waiting for some time, he drove to different motels looking for his wife, but did not find her. The next morning the defendant came in and plaintiff accused her of infidelity. On February 4, the plaintiff drove to Cape Canaveral, but returned home that afternoon. Pie found the defendant putting on her make-up and she informed the plaintiff that she was going out to dinner with John Miller, and added: T have got news for you, you and I are finished.’ She also stated T love this man, and we are going to get married.’
“Both plaintiff and defendant talked to Miller on the telephone and Miller was invited to come over and discuss the matter, but declined to do so. On February 5, the plaintiff closed their joint bank account and Maas Brothers account, and when he returned home the defendant was packing her things. Through the intervention of a friend, they were persuaded to reconcile. During the evening, the plaintiff and defendant had some drinks and the defendant started calling the plaintiff John. On February 6, the parties went to an attorney’s office who recommended that they go back together.
“On February 14, at 10:30 a. m., the plaintiff took the defendant to a luncheon of the New Tampans Club at Bartke’s. Around noon of that day the defendant called Miller stating she was very angry with her husband and had to talk to Miller. They both went to his motel room and talked to her daughter in Titusville. [Over the phone.] On February 20, the plaintiff learned that his wife was with John Miller on February 14. On February 22, he came back from Cape Canaveral, went directly to his attorney’s office with his stepdaughter, Ann Broughton, and detectives were employed. The detectives testified that they observed the defendant’s car at the Royal Orleans Motel and that she remained in Miller’s room at the motel from about 7:00 p. m. to 12:45 a. m. and again she remained in his motel room on the evening of February 26 from about 7:30 to midnight.
“The step-daughter, Ann Broughton, testified that she had seen her mother and John Miller together on January 29 and they said they were going to play golf. They returned before noon when Miller stated that he was going to take her mother out to dinner at the Hawaiian Village; that she saw them together again on February 1, and that they were going to play golf and eat *634 dinner on that day. On this occasion, there was another man accompanying them. She further testified that both Miller and her mother had expressed their love for each other and their intention of getting married.
“The defendant and Miller admit being together at dinners, luncheons, playing golf and in the motel room as testified to, by the plaintiff and the detectives, but assert that they were discussing their marital problems, watching television and that Miller was developing pictures. The defendant testified 'we had a lot to talk about, his problems and mine.’ Miller testified that he and the defendant had a lot in common.
“Considering the testimony as a whole, it shows that the defendant and Miller called each other on the phone, had luncheon and dinner dates, played golf together, confided to each other on their domestic problems. This conduct on their part is consistent with the testimony that they had each expressed love for each other with the intention of getting married as testified to by the plaintiff and his step-daughter. From these circumstances, I conclude that the desire was present and the opportunity was also established.
“I find it difficult to understand why they would spend two consecutive evenings in a motel room alone for a period of about five hours each evening for the sole purpose of talking, viewing television and developing photographs.
“The character and reputation of the defendant has been attested by her friends and neighbors and it is with considerable reluctance that I must find that the facts and circumstances testified to and admitted by the defendant as well as Miller, points to the conclusion that relations between the defendant and Miller were amorous and not platonic.
“From the foregoing, I find that the-plaintiff has met the burden of proving the allegations of his Complaint and' recommend that a decree of divorce be entered in favor of the plaintiff against the defendant.”
The defendant-wife filed exceptions to the foregoing report of the Special Master. The chancellor, in the order appealed, stated:
“It was agreed by both parties that testimony in the cause be taken by the Master and that he report his findings of fact and conclusions of law to the-Court.
“Our Supreme Court has held that where matters are submitted by agreement of the parties to a master for his findings and conclusions, that the findings then have the weight of a ver-diet of a jury. Harmon v. Harmon, (Fla.1949), 40 So.2d 209.
“Viewing the Master’s findings from' this pedestal, they can only be overturned for good cause, which would mean that they were clearly erroneous- or for the justice of the case. The charge of adultry is a serious one and-by its very nature, is difficult to prove. The Court in the case of Heath v. Heath, (Fla.1932) [103 Fla. 1071], 138 So. 796, 82 A.L.R. 537, established the-burden that the one charging adultry-must bear is:
“ ‘that if the circumstances proven' are such as to lead the guarded discretion of a reasonable just man to-the guilt of the participants that is-sufficient.’'
"The Court in the later case of McMillan v. McMillan, (Fla.1935) [120 Fla. 209] 162 So. 524, while agreeing with the burden, as enunciated in the-Heath case, also adopted the rule that:
“ ‘if desire and opportunity were proven adultry would be presumed.’
See Benson v. Benson, (Fla.App.1958) 102 So.2d 748.
*635 “The allegations of the Plaintiff’s 'Complaint, even though proven, do not mean these burdens were carried as re•quired by our courts. From all the •facts and circumstances and for the justice of the case and for good cause, this Court cannot find the desire even though the opportunity of adultry was established.”
The plaintiff-husband’s petition for re'hearing was denied and this timely appeal ensued.
In Harmon v. Harmon, Fla.1949, 40 So.2d 209, our Supreme Court held that presumptions favoring correctness of rulings •of chancellor based largely or solely on ■ questions of fact did not apply where all the ■testimony was actually heard by the master •selected by the chancellor and none of it was heard by the chancellor; that reports of master to whom matters are submitted by agreements of the party have the weight •of the verdict of the jury; and that where the chancellor has appointed a master and •empowered him to make findings on testimony, he may override or modify them in •any manner consistent with justice, but he may not do so except for a “good cause,” ■which means a showing that the findings of fact by the master are clearly erroneous.
In Harmon v. Harmon, supra, the Supreme Court, in its opinion by Mr. Justice 'Thomas, said:
“In approving the conclusion of the master on this point we have not disregarded the numerous decisions of this •court that every presumption favors •the correctness of the rulings of the chancellor; that a final decree, based largely or solely on questions of fact, will not be reversed unless the evidence clearly shows it to have been erroneous, Hamilton v. Laesch, 134 Fla. 591, 184 So. 110, a rule which was said in Guerra v. Guiterrez, 66 Fla. 570, 64 So. 232, to be especially applicable where the trial judge had heard the testimony. It would seem from this pronouncement that the presumption is one of degree, being stronger when the chancellor has himself heard the witnesses testify. This emphasis is particularly important in this case, where all the testimony was actually heard by the master selected by the chancellor, and none of it was heard by the latter. It is patent that the principal reason for the stronger presumption is that an appellate court gains its view of the controversy from the cold type of a record and has no first hand information therefore of the attitude or the demean- or of the witnesses and no way to interpret accurately the word of a witness where the meaning may be materially changed by the inflection of a voice or by the location of an accent. Of course where, as here, the chancellor has heard none of the witnesses, he has been placed at the same disadvantage.
“We have borne in mind too the decision of this court in Burns v. Burns, 153 Fla. 73, 13 So.2d 599, where Mr. Justice Brown, writing for the court, stated that the report of a special master was only advisory to the chancellor who was not obligated to follow the conclusions of law or of fact reached by the master.
■ “Parenthetically, this court has allied itself with those courts which place added importance on the reports of masters to whom matters are submitted by agreement of the parties. McAdow v. Smith, 127 Fla. 29, 172 So. 448; Kent v. Knowles, 101 Fla. 1375, 133 So. 315; Simpkins, A Federal Equity Suit, page 600 et seq.; 33 A.L.R. 765. In such situations it has been said by this court that the findings have the weight of the verdict of a jury. Croom v. Ocala Plumbing & Electric Company, 62 Fla. 460, 57 So. 243.
“While it cannot be questioned that in a case where the chancellor has appointed a master and empowered him *636 to make findings he may override or modify them in any manner consistent with the justice of the case, he may not do this except for good cause. We interpret 'good cause’ to mean a showing that the findings of fact by the master were clearly erroneous.
“ * * * * * *
“In fine, we have the view that where, as in this case, a competent master is selected by the chancellor and attentively conducts the hearings, thoroughly digests the testimony of the witnesses, and arrives at conclusions which are logical and well supported, his findings, although advisory, should not be set aside arbitrarily or capriciously (of which there is no claim in this case) nor should they be disregarded or overruled by the chancellor simply because of an opinion of the chancellor at variance with that of the master. As we have said, the master was acting as an accredited agent of the chancellor and was at the time performing a service which would have been performed by the chancellor himself but for the appointment. Having seen and heard the witnesses, he had a definite advantage over the chancellor, who reviewed the case from a typewritten record.”
In Frank v. Frank, Fla.1954, 75 So.2d 282, a Special Master was appointed by agreement or consent of the parties to make findings of fact, conclusions of law and recommendations. The Master recommended the granting of a divorce to the appellant Doris Frank. The report of the Special Master was approved and adopted by Circuit Judge Wayne Allen who subsequently died and another circuit judge, on rehearing, did not follow the Master’s recommendations. The Supreme Court, in its opinion reversing the second circuit judge, said:
“We have carefully considered the evidence and have concluded that we must sustain appellant’s contention. This court has ofttimes made the pronouncement that if a special master is appointed, by agreement or consent of the parties to a chancery cause, with authority to make findings of fact, conclusions of law and recommendations, his findings and recommendations should be approved and adopted by the chancellor unless clearly erroneous or it appears that the master has misconceived the legal effect of the evidence. Harmon v. Harmon, Fla., 40 So.2d 209; McAdow v. Smith, 127 Fla. 29, 172 So. 448; Kent v. Knowles, 101 Fla. 1375, 133 So. 315. And see Slatcoff v. Dezen, Fla., 74 So.2d 59. Of course, the master’s findings of fact would be clearly erroneous if the record should fail to contain evidence in support thereof which is both competent and substantial.
“ * * * As a matter of law we must consider the final decree from which this appeal was taken just as though, upon rehearing, it had been entered by the chancellor who entered the original decree. We must determine whether in entering the ultimate ‘final decree’ the chancellor observed the rule laid down by this court that the findings of fact made by a special master appointed as was the master herein (i. e., by tacit consent of the parties and with authority to take the testimony and report the same together with his findings of fact, conclusions of law and his recommendations) should not be'set aside at the bare discretion of the chancellor but only when such findings are clearly erroneous. With this query as well as the foregoing rule in mind, we approach the problem thus presented.”
The Florida Supreme Court, in Foreman v. Foreman, Fla.1949, 40 So.2d 560, said:
“The learned chancellor gave no reason why he disagreed. The law is settled that adultery will not forfeit the wife’s property, although she is *637 not entitled to alimony. See Heath v. Heath, 103 Fla. 1071, 138 So. 796, 82 A.L.R. 537. The master saw and heard the witnesses; he had every advantage to evaluate the testimony which appears to be sufficient predicate for his conclusion. To merely differ with the fact finder without justification and reason shown will not be approved. There is no indication that the Master misapplied the law to the facts. For the chancellor to waive the findings aside without favoring us with any excuse or reason places us at a loss to find just cause to sustain his decree, and for that reason it is reversed with directions to allow the appellant a just portion of the property in question.”
This court said in Gulf Coast Docks v. Simon, Fla.App.1960, 122 So.2d 414, 415:
“The parties stipulated that S. Henry Harris, Esquire, be appointed as special master, with power to make findings of fact and rulings of law and an order was entered accordingly.
“The record contains substantial competent evidence supporting the master’s findings. In the case of Aldred v. Romano et al., Fla.1952, 58 So.2d 436, 438, the court said:
“ ‘We emphasize selection of the master by counsel who stipulated that he be empowered to make findings of law and fact. The court honored the stipulation by formal order. We need not elaborate on the weight that should be given his findings for we have already done that in Harmon v. Harmon, Fla., 40 So.2d 209, and Florida National Bank & Trust Co. of Miami v. Brown, Fla., 47 So.2d 748. In few words, the report of the master came to the chancellor bearing the dignity of a verdict of a jury, not to be disturbed unless shown to be clearly erroneous.’
“The master’s findings have not been shown to be clearly erroneous. See Calhoun v. Abstract Company of Sarasota et al., Fla.1950, 44 So.2d 83, and English v. Smith, Fla.App.1957, 97 So.2d 339.”
The lower court, in the Order on Exceptions to Master’s Report before mentioned, said:
“The allegations of the Plaintiff’s complaint, even though proven, do not mean these burdens were carried as required by our courts. From all the facts and circumstances and for the justice of the case and for good cause, this Court cannot find the desire even though the opportunity of adultry was established.”
Thus, the chancellor disagrees with the determination of fact made by the Special Master whose appointment was agreed and stipulated to by the parties to this cause.
The evidence before the Master included the testimony of several witnesses that on the evening of February 25th and from 7:30 p. m. until midnight on February 26, 1963, the defendant was in a motel room with John Miller, a man she said she loved, in Tampa, Florida. The defendant did not deny this but insisted that there was no immoral conduct on her part and adduced testimony as to her good character and reputation from several of her friends and neighbors. The witness John Miller testified that he had seen Mrs. Petersen outside of Hillsborough County on occasions, having had dinner with her one time in St. Petersburg and also having seen her in Cape Canaveral.
Ann Broughton, a daughter of the defendant and stepdaughter of the plaintiff, stated that her mother, after asking her how she would like two brothers that she had always wanted, had stated that Pete wasn’t man enough to give her one.
The plaintiff testified that on an occasion when he had come home his wife asked him, “What are you doing home?” He replied, “I have a right to be home, this is my home,” and she said, “I am going out to *638 ■dinner with John Miller.” She then said, “I have got news for you, you and I are 'finished,” and further said, “I love this man, •and we are going to get married.” The plaintiff further stated:
“ * * * I said, and I pointed to the complaint that on the night of the 25th and 26th, it was true. She had said on the night of the 25th, she told my son that she was going out with John Miller, and then she said, ‘Both John and I said that if you didn’t do something about it now you were stupid.’ ”
The plaintiff also testified that he had ■called John Miller over the telephone and “asked him to come over again and sit •down and talk this thing out, because there were ten people involved: my children, his •children and ourselves, to which he replied, '‘no, you have been drinking and you are mad, and you might shoot me, and you have ■every legal right to do it.’ ” The plaintiff testified that he replied, “Yes, I have been -drinking a lot. I got out of my bed at 4:30 this morning. I made two projects and drove back from Cape Canaveral all in the same day and it is now 6:15 in the afternoon, and so I have been drinking a lot” and then hung up the phone.
It was the function of the Master to determine the truth or falsity as well as the competency of the evidence adduced before him. There were many conflicts in the evidence but the Master determined from the evidence that the defendant and Miller had both the opportunity and the desire. The Master was the one who heard the evidence, not the chancellor. We do not find anything in the chancellor’s Order on Exceptions to the Master’s Report that would overcome the weight of the-Master’s Report and his conclusions both of law and facts. Accordingly, the decree is reversed and the cause remanded for entry of a decree consistent with the Master’s recommendation and the view herein expressed.
ANDREWS, J., and WILLSON, J. H., Associate Judge, concur.